# United States Court of Appeals
## For the First Circuit

_____

No. 01-1989

MICHAEL ALDRIDGE, individually and on behalf of
all others similarly situated,

Plaintiff, Appellant,

v.

A.T. CROSS CORPORATION, BRADFORD R. BOSS, RUSSELL A. BOSS, W.
RUSSELL BOSS JR. TRUST A, W. RUSSELL BOSS JR. TRUST B, W. RUSSELL
BOSS JR. TRUST C, JOHN E. BUCKLEY, and JOHN T. RUGGIERI,

Defendants, Appellees.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

_____

Before

Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

_____

Lawrence Deutsch with whom Shanon J. Carson, Berger &
Montague, P.C., Matthew F. Medeiros, and Little, Bulman, Medeiros
& Whitney, P.C. were on brief for appellant.
John F. Sylvia with whom R. Robert Popeo, Stephen T. Murray,
Justin S. Kudler, and Mintz, Levin, Cohn, Ferris, Glovsky and
Popeo, P.C. were on brief for appellees A.T. Cross Company,
Bradford R. Boss, Russell A. Boss, John E. Buckley, and John T.
Ruggieri.
William R. Grimm with whom Charles D. Blackman and Hinckley,
Allen & Snyder LLP were on brief for appellees W. Russell Boss Jr.

Trust A, W. Russell Boss Jr. Trust B, and W. Russell Boss Jr. Trust C.

_____

March 20, 2002

_____

**LYNCH**, **Circuit Judge**.  In early 1998 the A.T. Cross Corporation, a venerable New England maker of fine pens and pencils, entered the personal electronic devices market by offering pen-based computing products through its Pen Computing Group (PCG). The stars of its new line were the CrossPad and its later-introduced smaller cousin, the CrossPad XP.  Cross had high hopes for its new product line and expressed those hopes publicly in September 1997 by saying it expected to report a minimum of $25 million in profitable sales for PCG in 1998.  Indeed, one of Cross's officers compared its fledgling product to the highly successful Palm Pilot.

Reality did not keep pace with these projections.  By late 1999 Cross had discontinued the product line and suffered losses that year of $24.3 million, which essentially eliminated profits from the $24.8 million in sales on the PCG products in 1998.

Michael Aldridge brought this securities action in April 2000 as a putative class action on behalf of those who purchased Cross common stock between September 17, 1997 and April 22, 1999 (the class period).  An amended complaint asserts claims against the company, four officers of the company, and certain trusts which own part of Cross.  The complaint alleges violations of section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (2000), and Rule 10b-5 under that Act, 17 C.F.R. § 240.10b-5 (2001), against the company, the individual defendants, and the trusts.  It also alleges a section 20(a) claim against the

individual and trust defendants as "controlling person[s]."[1] 15 U.S.C. § 78t(a) (2000).

On a Rule 12(b)(6) motion by the defendants, the district court dismissed the action. Aldridge v. A.T. Cross Corp., No. 00-203ML (D.R.I. June 4, 2001). The court did not reach the question of whether to certify a class.

We reverse the dismissal of the claims against the individual defendants and the company. We find that there is sufficient factual support for the allegations of fraud and a strong inference of scienter to survive a motion to dismiss under the Private Securities Litigation Reform Act (PSLRA). We affirm the dismissal of the section 20(a) claim against the trust defendants on different grounds; on these pleadings, the trust defendants cannot be considered "controlling persons" for the purpose of section 20(a) liability.

I.

Because this is an appeal from a motion to dismiss, we describe the facts in the case in the light most favorable to Aldridge, the plaintiff and nonmoving party. Doe v. Walker, 193 F.3d 42, 42 (1st Cir. 1999).

---

[1] The individual defendants were members of the Cross management team during the class period: Bradford Boss, Chairman of Cross's board; Russell Boss, President and CEO of Cross; John Buckley, Executive Vice President and COO; and John T. Ruggieri, Senior Vice President and CFO. The trust defendants are: the W. Russell Boss Jr. Trust A; the W. Russell Boss Jr. Trust B; and the W. Russell Boss Jr. Trust C. For purposes of all but the section 20(a) analysis, we refer to all of the defendants as the company.

-4-

Cross is a publicly traded company on the American Stock Exchange. For over a century, Cross has been producing traditional high-end writing instruments. By the mid 1990s, sales of these products were dropping off, and the company's stock price had decreased significantly since 1990. In July 1996, Cross established a new division it called the Pen Computing Group (PCG) in an effort to "bridge . . . the worlds of traditional and electronic paper," to expand the company's traditional product base, and "to return Cross to acceptable margins and earnings."

One of these PCG products was the CrossPad, unveiled in November 1997, and first shipped in March 1998. The CrossPad XP, a smaller model, was introduced to the market in October 1998. The CrossPads were electronic note pads with digital pens, with which a user wrote on a note pad atop a battery powered unit. The pens wrote on the paper in the traditional way and also recorded the pen strokes for later connection to a computer. Once the information was stored in a computer, it could be viewed, searched, and otherwise used.

There was a great deal of optimism about the CrossPads and their positive impact on Cross as a whole. On September 17, 1997, even before unveiling the CrossPad, Cross issued a press release announcing that the company expected at least $25 million in profitable sales from PCG in 1998. On March 23, 1998, Cross filed a 10-K report with the SEC for the fiscal year 1997, which stated: "We look at 1998 as a year where . . . our Pen Computing Group will provide its first year of significant sales and

earnings." The bulk of PCG's business was the CrossPad product line. In an April 1998 article in Value Line, an investment publication, Cross's management said that sales of the CrossPad would drive PCG's growth, and predicted sales of $200 million in the year 2000. In a June 1998 article in Barron's, another investment publication, management predicted that CrossPad could triple the size of the company. On June 30, 1998, the Cross share price peaked for the class period at $14.25.

In Cross's 1998 filings with the SEC, the company continued to report significant sales growth for PCG products. In a business article dated February 4, 1999, the Providence Journal quoted Brian Mullins, the Director of Marketing for PCG, as saying that PCG's "sales for all of 1998 did meet the Company's goal of $25 million in sales."

Despite the earlier optimism, Cross began to lower the market's expectations beginning in early 1999. The same February 4 Providence Journal article discusses Mullins's comments on the recently announced price reductions for both the CrossPad and the CrossPad XP. He stated that the price cuts were not related to the sales of the products but were "planned . . . from the get go" and were expected by the retailers. The article paraphrases Mullins as saying that "even with the price cuts, the company will still make a profit." He also said that more price cuts were expected later in the year. On March 23, 1999, the company filed its 10-K report with the SEC. The report stated the success of the CrossPad sales in 1998, but it also acknowledged the price reductions and "greater

marketing support and technical development [than] planned, which resulted in a loss for Pen Computing operations."

On April 22, 1999, Cross announced in a press release that the company's sales had dropped dramatically from $9 million in the first quarter of 1998 to $1.1 million in the first quarter of 1999. It also expressed its expectation that revenues from PCG would be a great deal lower in 1999 than they were in 1998.

On the same day, Cross's management held a conference call with securities analysts and investors to discuss the company's results for the first quarter of 1999. During the call, Russell Boss, President and CEO of Cross, explained that PCG sales had decreased in the first quarter "because of price protections." He also mentioned "take backs" from customers. Robert Byrnes, President and CEO of PCG also spoke about "price protection," and said that the price reductions were part of the company's original sales strategy. John Buckley, Cross's Executive Vice President and Chief Operating Officer, also acknowledged the company's price protection practices. Cross did not disclose any price protection plans or take back agreements in its public financial disclosures in 1998.

Also on April 22, Russell Boss and Bradford Boss announced that they were stepping down from their positions as CEO and executive Chairman respectively, and stepping into the positions of non-executive Chairman, and non-executive Chairman Emeritus. Immediately after the end of the class period, on April 22, 1999, the share price for Cross fell below $4.

-7-

PCG sales continued to decline in 1999. On May 13, 1999, the company filed a 10-Q report for the first quarter of the year, and revealed for the first time in a SEC filing a "rebate" program it had with its customers. In a 10-Q report issued on August 13, 1999, the company reported over $8 million in losses for PCG in the second quarter of 1999, and an 85% decline in PCG sales compared to the same quarter the previous year. The company pointed to the excess inventory its customers had as a reason for the decrease in sales.

Finally, the CrossPad product line was discontinued at the end of 1999 because of poor performance in the market. In a Form 10-K filed on March 23, 2000, Cross's new President and CEO discussed PCG's decline in 1999. He stated:

> Early in the year [1999] it became clear that our investment[] in the Pen Computing Group . . . w[as] a significant drain on the Company's financial and human resources. As a result, in the fourth quarter, the Company discontinued the CrossPad product line . . . .

The company also described a revenue recognition policy not disclosed earlier, which stated: "Revenue from sales is recognized upon shipment or delivery of goods. Provision is made at the time the related revenue is recognized for estimated product returns, term discounts and rebates."

Aldridge, the plaintiff, brought a claim under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (2000), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (2001), for fraud against Cross, members of its top management team, and three trusts that own a large number of shares in the company. He argues

that the statements made by the company and its management during the class period were misleading in light of the company's sales and accounting practices. Specifically, Aldridge says that the company employed sales strategies, such as price protection, take backs, and channel stuffing, without disclosing them to the shareholders, or reserving for them in financial statements, as they were obligated to do. Aldridge also brought a claim under section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a) (2000), against the individual defendants and the trust defendants as "controlling persons" of the corporation. Aldridge argues that the trust defendants, "[b]y reason of their ownership and ability to select two-thirds of the Board," and the individual defendants influenced and steered the company to engage in fraudulent conduct.

The district court dismissed the action on a Rule 12(b)(6) motion under the standards of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4 (2000), finding Aldridge had neither provided sufficient factual support for the allegations of fraud nor raised a strong inference of scienter. Aldridge v. A.T. Cross Corp., No. 00-203ML, slip. op. at 10-15 (D.R.I. June 4, 2001). The district court, without reaching the details of the controlling person issue, also dismissed the section 20(a) claim against the individual defendants and the trust defendants because it was derivative of the dismissed section 10(b) claim. Id. at 15-16. The court did not reach the question of whether to certify a class.

II.

Our review of the allowance of a motion to dismiss is de novo. <u>Serabian</u> v. <u>Amoskeag Bank Shares, Inc.</u>, 24 F.3d 357, 361 (1st Cir. 1994). The pleading standards for violations of section 10(b) and Rule 10b-5 are found in the PSLRA, 15 U.S.C. §78u-4.[2] This circuit's seminal case on the pleading standards under the PSLRA is <u>Greebel</u> v. <u>FTP Software, Inc.</u>, 194 F.3d 185, 193-94 (1st Cir. 1999). In <u>Greebel</u>, we held that the PSLRA did not alter this circuit's rigorous reading of the standards for pleading fraud. The plaintiff in a securities fraud action must "specify each

_____

[2]      The statute provides, in relevant part:

        (b)   Requirements for securities fraud actions
              (1)  Misleading statements and omissions
              In any private action arising under this chapter in
              which the plaintiff alleges that the defendant --
                    (A)  made an untrue statement of a material
                    fact; or
                    (B)  omitted to state a material fact necessary
                    in order  to make the statements made, in the
                    light of the circumstances in which they
                    were made, not misleading;
              the complaint shall specify each statement alleged
              to have been misleading, the reason or reasons why
              the statement is misleading, and, if an allegation
              regarding the statement or omission is made on
              information and belief, the complaint shall state
              with particularity all facts on which that belief
              is formed.
              (2)  Required state of mind
              In any private action arising under this chapter in
              which the plaintiff may recover money damages only
              on proof that the defendant acted with a particular
              state of mind, the complaint shall, with respect to
              each act or omission alleged to violate this
              chapter, state with particularity facts giving rise
              to a strong inference that the defendant acted with
              the required state of mind.
15 U.S.C. §§ 78u-4(b)(1)-(2).

allegedly misleading statement or omission" including its time, place and content.  Id. at 193.  The plaintiff must provide factual support for the claim that the statements or omissions were fraudulent, that is, facts that show exactly why the statements or omissions were misleading.  Id. at 193-94.  If the plaintiff brings his claims on information and belief, he must "set forth the source of the information and the reasons for the belief."  Id. at 194 (quoting Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991)) (internal quotation marks omitted).  The plaintiff must also show that the inferences of scienter "are both reasonable and 'strong.'"  Id. at 195-96.

Although the pleading requirements under the PSLRA are strict, id. at 194, they do not change the standard of review for a motion to dismiss.  Even under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter.  Id. at 201; accord Helwig v. Vencor, Inc., 251 F.3d 540, 553 (6th Cir. 2001) (en banc), petition for cert. filed, 70 U.S.L.W. 3269 (Sept. 27, 2001) (No. 01-538).

A.  Fraud Allegations

The district court correctly found that Aldridge had met the specificity requirements as to "time, place and content" of the statements said to be misleading.  Aldridge, slip. op. at 10.  The district court faulted the complaint, however, for failing to provide factual support for the allegations of fraud.  Id. at 10-

11. The district court concluded that even if Cross made false statements or material omissions, there is no support for the proposition that the defendants knew these statements or omissions were misleading at the time they were made. It also relied on the absence of specific figures regarding which transactions were misstated and by what amounts. It was here that the court erred. The district court did not "giv[e] plaintiff[] the benefit of all reasonable inferences" as it should have on a motion to dismiss, Greebel, 194 F.3d at 201, but appears to have drawn its inferences in the defendants' favor. We take the plaintiff's allegations to be true and draw inferences in the plaintiff's favor.

Aldridge's core claim is that the reported revenues and earnings in A.T. Cross's financial statements were artificially inflated, and that the statements contained omissions of material facts. Aldridge alleges that under generally accepted accounting principles (GAAP), with which Cross purported to comply, Cross was required to estimate a loss or range of loss and set a reserve with respect to all contingent sales that were made, including sales for which the buyer had the right to receive a credit or allowance if the price of the CrossPad declined before the buyer could resell the product (i.e., price protection). If Cross was unable to establish a reserve or estimate the loss, it was required to disclose the practices that gave rise to the contingent revenues and earnings. Aldridge alleges that the defendants knew that Cross had not sufficiently reserved for the losses that inevitably would occur when Cross was forced to honor its price protection

-12-

commitments, and that their failure to disclose this to the public violated federal regulations (specifically Item 303 of the SEC's Regulation S-K) and accounting standards. See 17 C.F.R. § 229.303(a) (2001) (requiring that SEC filings "provide . . . information that the registrant believes to be necessary to an understanding of its financial condition"); Accounting for Contingencies, Statement of Financial Accounting Standards No. 5, ¶ 10 (Financial Accounting Standards Bd. 1975); Revenue Recognition When Right of Return Exists, Statement of Financial Accounting Standards No. 48, ¶ 7 (Financial Accounting Standards Bd. 1981) ("FAS 48"). Cross has not argued that the information that was not provided in the financial statements was not material.

The district court's holding hinged on a key issue: whether, from the statements made by company officials in 1999, it could be reasonably inferred that Cross had engaged in undisclosed price protection earlier, in 1998. The district court thought not. If there was no price protection or similar practice in 1998, the district court concluded, then the company's financial statements did not contain misleading omissions. Our view is to the contrary: it is an extremely reasonable inference, from the defendants' statements in 1999, that the company had offered its customers price protection guarantees in 1998, likely to induce them to carry the new CrossPad product lines. From this, it may easily be inferred that the statements were misleading and that the defendants knew that they were misleading.

There were several statements in 1999 that support the inferences. First, in February 1999, the prices of the CrossPad products were discounted by up to 30%. A February 4 business article in the Providence Journal reported the price reductions and cited Mullins, the Director of Marketing, as saying that the company would make a profit on the CrossPads even with the price cuts.[3] The article also reported (obviously relying on company sources and most likely on Mullins) that price cuts "had been planned since the products were introduced." Mullins was quoted as saying that "the price cuts were not related to how well the units were selling." Mullins said "[w]e actually had planned it from the get go. We told the retailers to expect it."

In this context, "from the get go" is easily read to mean from the introduction of the new product to the market in 1998. If the price cuts were planned from early 1998, it is entirely reasonable to think that price protection for the stores selling the product was also discussed and agreed on at that time, to insulate the retailers from the inevitable price reductions.

The price reductions were also discussed at Cross's April 22, 1999 conference call with analysts and investors. During that conference call Byrnes, the head of PCG, said that the price reductions were in line with the company's original strategy, but

_____

[3] At oral argument Cross argued that Mullins, the Director of Marketing, lacked authority to make admissions. See Fed. R. Evid. 801(d)(2). That seems improbable; but we need not decide it as an evidentiary matter as we take inferences in the plaintiff's favor, and there is a strong inference that a Director of Marketing had authority to make such statements.

were not put into place until February 1999. President Russell Boss said that "PCG business was down" in the first quarter of 1999 "because of price protections [Cross] gave retailers." Two other corporate officers, including Byrnes, mentioned that there was a price protection program.

There is a possibility that the Cross officers used the term "price protection" in some specialized narrow sense for a right to reimbursement offered by the company to the retailers once the CrossPads had already been on the store shelves for some months. However, on this record it is just as likely, if not more likely, that Aldridge's more common definition of price protection is what was meant: "Price protection is a retailer's or distributor's right to reimbursement in the event of post-sale price reductions." As Aldridge argues, "[t]hat price protection is a right implies that it is bargained for at the time the retailer/distributor contracts to buy product from the manufacturer," not once the product has been on the shelves for several months.

Aldridge also argues that under accounting rules, booking sales subject to price protection requires adequate accounting reserves at the time of sale to offset the effects of such price protection. Otherwise, such sales should not be recognized as revenue. If a reserve is not set up -- because, for example, the size of the contingencies was impossible to estimate -- disclosure should be made. See Greebel, 194 F.3d at 203 (discussing FAS 48).

In dismissing the case, the district court referred to a statement in Greebel that the absence of specific identifying information as to the amount and nature of contingent sales transactions was indicative of the generality of the allegations of violations of GAAP standards such as FAS 48, and thus insufficient by itself to infer scienter. Aldridge, slip op. at 11 (citing Greebel, 194 F.3d at 203-04). However, in Greebel, there was no evidence of statements by management indicating material undisclosed contingencies, while here there was such evidence. Further, it is reasonable to infer that in this case all customers were offered price protection as a matter of company policy. Cross itself attributed losses in early 1999 in part to its price protection program. There was therefore little need for the type of specificity discussed in Greebel. In Greebel, the argument that contingent sales were not properly accounted for under FAS 48 was made largely in service of more direct claims of warehousing and whiting out, claims which, even after discovery, lacked any factual support. Here, in contrast, there is a reasonable inference of a pattern of price protection. Further, the evidence that contingent sales were not accounted for as they should have been under FAS 48 was offered in Greebel as indirect evidence of scienter, and there was discounted, in the absence of particulars and other evidence of scienter. Greebel did not hold that a plaintiff, before discovery, must in every case allege the amount of overstatement of revenues and earnings in order to state a claim that undisclosed price protection schemes were fraudulent. 194 F.3d at 204 (relying on

-16-

"complete absence" of particulars but refusing to hold that such information must appear in a complaint).

Aldridge also attempts to support the inference that a price protection program was entered into in 1998 but not disclosed at the time with allegations of two corollary practices: take backs and channel stuffing. A "take back" is a promise to take back goods from customers who have been unable to sell them. In the April 22, 1999 conference call, Russell Boss specifically used the phrase "take back." Again, it is reasonable to infer that a take back guarantee for the retailers of CrossPads was agreed to in 1998, because a take back agreement, just like price protection, is likely to have been part of the original bargain between Cross and its customers. No take back agreements were disclosed in the company's 1998 public statements and filings. The take back allegations therefore support Aldridge's claim that Cross engaged in undisclosed price protection.

Channel stuffing, in turn, was defined in <u>Greebel</u>:

"Channel stuffing" means inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company. It has the result of shifting earnings into earlier quarters, quite likely to the detriment of earnings in later quarters.

194 F.3d at 202. Aldridge's allegation is that 50% of the store placements for the CrossPad took place in the last four months of 1998 and that 36% of PCG sales occurred in the last three months of 1998. These figures might well be explained by holiday season sales. Beyond that, the second quarter 1999 Form 10-Q report stated that the 85% reduction in sales from the prior year was

-17-

attributable to retailers having significantly reduced their purchases as they reduced their current inventory levels. Also, the company's expenses were higher as it administered a rebate promotion "to reduce channel inventory at the retail level." This information may or may not suggest that more inventory was in the hands of the retailers than commercially warranted. "There is nothing inherently improper in pressing for sales to be made earlier than in the normal course," id. at 202, and in this case, the channel stuffing allegations at present are neutral. After discovery, however, they may play a supporting role in buttressing the price protection inferences.

The company says this is a garden variety "fraud by hindsight" case, occasioned by the large drop in sales of CrossPad products after 1998. That characterization is off the mark. Fraud by hindsight occurs when a plaintiff "simply contrast[s] a defendant's past optimism with less favorable actual results, and then 'contend[s] that the difference must be attributable to fraud.'" Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1223 (1st Cir. 1996) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)). In this case, on the other hand, Aldridge complains that the company failed to disclose certain known material information as to the contingent nature of the sales, and that Cross essentially admitted to the 1998 contingencies in 1999.

The allegations of fraud in the complaint have sufficient factual support to survive a motion to dismiss. A closer question is whether the allegations of scienter are sufficient.

-18-

B. Scienter

Scienter, which is a requirement for liability under section 10(b) and Rule 10b-5, is "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). To win a section 10(b) case, the plaintiff must show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness. Greebel, 194 F.3d at 198-201.

In Greebel, we held that the PSLRA did not mandate a particular test to determine scienter and that this court would continue to use its case by case fact-specific approach; "we . . . analyze[] the particular facts alleged in each individual case to determine whether the allegations were sufficient to support scienter." 194 F.3d at 196; accord City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1262-63 (10th Cir. 2001) (adopting Greebel's fact-specific approach); Helwig, 251 F.3d at 551 (same). Thus, the plaintiff may combine various facts and circumstances indicating fraudulent intent to show a strong inference of scienter. As part of the mix of facts, the plaintiff may allege that the defendants had the motive ("concrete benefits that could be realized by . . . the false statements and wrongful nondisclosures") and opportunity ("the means and likely prospect of achieving concrete benefits by the means alleged") to commit the fraud. Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir.) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)), cert denied, 531 U.S. 1012 (2000). However, as we stated in Greebel, while mere allegations of motive

-19-

and opportunity alone may be insufficient, together with additional factual support, evidence of motive and opportunity may establish a strong inference of scienter.  194 F.3d at 197.

In evaluating whether the inferences of scienter are strong, we agree with the Sixth Circuit's language that: "Inferences must be reasonable and strong -- but not irrefutable. . . . Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder."  Helwig, 251 F.3d at 553.  The plaintiff must show that his characterization of the events and circumstances as showing scienter is highly likely.

Taking all the facts and circumstances into consideration, the complaint survives the requirement that its pleadings raise a strong inference of scienter.  First, strong inferences can be made that the company offered price protection and take back arrangements in 1998.[4]  These arrangements, if they existed, were not disclosed, and that nondisclosure could hardly have been inadvertent.  The company only disclosed the price protection and take back agreements in an April 1999 conference call with industry analysts and investors.  Full public disclosure of the agreements only occurred in the Form 10-Q report filed on May 13, 1999.  Although the company officials referred to "price protection" during the conference call, the report used the term

---

[4]    Aldridge could have buttressed his case by obtaining information, if available absent discovery, from Cross's customers on the price protection and take back allegations.  In another case the failure to make that effort might prove fatal.  Here it is not.

"rebates," which may suggest an attempt to recharacterize the events. Of course, more than mere proof that the defendants made a particular false or misleading statement is required to show scienter. Geffon v. Micrion Corp., 249 F.3d 29, 36 (1st Cir. 2001). However, the fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter. Fl. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 665 (8th Cir. 2001) (collecting cases from various circuit courts).

Second, building on the reasonable inference that either or both the price protection or take back guarantees were in place in 1998, it may also be inferred that accounting standards required that a reserve be established or at least that Cross disclose the sales practices in its financial statements. This is also evidence of scienter. See Geffon, 249 F.3d at 35 (noting that "accounting shenanigans" may be evidence of scienter). There is evidence that the defendants acted with knowledge and intent when they did not account for the sales practices in the company's reports in 1998. In the Form 10-K filed by the company on March 23, 2000, after a new company president was installed, Cross disclosed for the first time after the dramatic PCG losses, a revenue recognition policy: "Revenue from sales is recognized upon shipment or delivery of goods. Provision is made at the time the related revenue is recognized for product returns, term discounts and rebates."

The company argues that because it has never restated any of its financials or otherwise indicated any error in the 1998

-21-

financial statements, and because its financial statements were audited by an independent accounting firm, no inference of accounting error, and so no inference of scienter, can be drawn. We disagree. Had the 1998 financials been restated, that might well have been useful to Aldridge. However, the fact that the financial statements for the year in question were not restated does not end Aldridge's case when he has otherwise met the pleading requirements of the PSLRA. To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements.

Third, the Cross corporate officers had some particular financial incentives to load sales and earnings into 1998. Their compensation depended on the company's earnings; as Cross correctly notes, that fact alone is not and cannot be enough to establish scienter. Green Tree, 270 F.3d at 661; Fleming Cos., 264 F.3d at 1269-70; Novak, 216 F.3d at 307. What makes this case different are the inferences that corporate officers understood in 1997 and 1998 that the success of the new products, and of taking the old line company into a new world, was important to their own survival and that of the company. Indeed, the complaint alleges that Russell said, "If I can't turn the company around in one year, I won't be here." This gave incentive to maximize 1998 earnings in particular. When financial incentives to exaggerate earnings go

far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter.  See, e.g., Green Tree, 270 F.3d at 661 (reversing trial court decision based on lack of scienter where it was reasonable to infer that defendant officer maximized his compensation by overstating earnings before his contract ran out).

More specifically, the individual defendants were the ones who set the target sales goal of $25 million, and their jobs were in jeopardy if the goals were not met.  Moreover, the CrossPad product line was very important to Cross.  In April 1998 the defendants were quoted as stating that the CrossPad would be the primary driver of PCG's growth.  In a September 30, 1998 press release, Cross stated that the sales of PCG products made up 34% of the company's total domestic revenue.  That being so, there was incentive to maximize profits in 1998 by various means.  See Greebel, 194 F.3d at 196 (stating that "self-interested motivation of defendants in the form of saving their salaries or jobs" may be evidence of scienter).  As it turned out, the company President, Russell Boss, and Chairman, Bradford Boss, did resign after the disastrous first quarter 1999 results were made public.

Playing lesser but supporting roles in the factual analysis, there were the additional financial incentives to management to overstate 1998 profits.  The exercise price of the individual defendants' stock options was lowered in 1997, just before the introduction of the new product line.  The exercise price was lowered again to match the market price in December 1998.

There is no evidence that the defendants exercised their options; Aldridge's point is rather that the adjustment in price created incentives to "boost A.T. Cross share price." The adjustments in the exercise price of the defendants' stock options alone are not enough to create a strong inference of scienter. But this fact is not alone here. While this case does not involve trading while in possession of material nonpublic information, which in some circumstances may be taken to support allegations of motive, see, e.g., Acito v. IMCERA Grp., 47 F.3d 47, 54 (2d Cir. 1995), there were sufficient other sources of financial motive that make the absence of such evidence less important here.

Our conclusion that Aldridge's section 10(b) and Rule 10b-5 claim survives a motion to dismiss is only that. The defendants may yet prevail once the facts of the case are further developed.[5]

C.  Section 20(a) Claim

The district court's dismissal of the section 20(a) claim was derivative of its dismissal of the section 10(b) claim. See Suna v. Bailey Corp., 107 F.3d 64, 72 (1st Cir. 1997). Because there must be a primary violation for liability under section 20(a), the district court did not independently evaluate whether the claim otherwise failed. Nonetheless, we "may affirm a district court's judgment on any grounds supported by the record." Greenless v. Almond, 277 F.3d 601, 605 (1st Cir. 2002).

---

[5]    We leave to the district court on remand Aldridge's argument that there is a sub-class of the 1999 investors.

As to the trust defendants only, the matter is plain enough to affirm the dismissal of the section 20(a) claim against them.  Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (2000).

The trust defendants argue that this court should adopt a three part test for controlling person liability, under which the plaintiff must allege and prove: (1) an underlying violation by a controlled person or entity; (2) the defendants control the violator; and (3) the defendants are in a meaningful sense culpable participants in the fraud in question.  See SEC v. First Jersey Secs. Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).  They correctly described a split among the circuits on whether an element of section 20(a) liability is "culpable participation."[6]  We do not reach that question, but rest on the "control" element.

To meet the control element, the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company.  See

---

[6] Whether culpable participation is a required element of liability under section 20(a) has generated a great deal of discussion.  Compare First Jersey Secs., 101 F.3d at 1472-73 (applying such a requirement), with Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990) (en banc) (rejecting such a requirement); see generally 3C H. Bloomenthal & S. Wolff, Securities and Federal Corporate Law § 14.9 (2d ed. 1999) (discussing the culpable participant requirement).

-25-

<u>Sheinkopf</u> v. <u>Stone</u>, 927 F.2d 1259, 1270 (1st Cir. 1991) ("For [the defendant] to be liable . . . there must be 'significantly probative' evidence that the [defendant] exercised, directly or indirectly, meaningful hegemony over the . . . venture . . . .") (internal citation omitted); <u>see</u> <u>also</u> <u>Harrison</u> v. <u>Dean Witter Reynolds, Inc.</u>, 974 F.2d 873, 880-881 (7th Cir. 1992) (describing a similar requirement). In this case, the trust defendants have the power to elect two-thirds of the directors. But they have no direct control over the management and operations of the company. At most the evidence pled is that the trust defendants are controlling shareholders. This indicates some potential ability to control. In the absence of some indicia of the <u>exercise</u> of control over the entity primarily liable, however, that status alone is not enough. Although controlling shareholders own the majority of the shares in a company, they, like any other shareholders, should have the ability to be passive, leaving the management to the directors and officers. <u>See</u> L. Carson, <u>The Liability of Controlling Persons Under the Federal Securities Acts</u>, 72 Notre Dame L. Rev. 263, 318-19 (1997). Unless there are facts that indicate that the controlling shareholders were actively participating in the decisionmaking processes of the corporation, no controlling person liability can be imposed. In this case, no facts are pled permitting an inference that the trust defendants actually exercised control over Cross.

III.

The case will be reinstated as to the company and the individual defendants. The district court may wish to consider limiting discovery initially to key issues. Nothing in this opinion, of course, predicts any outcome if a postdiscovery summary judgment motion is filed or the matter goes to trial. Where there is smoke, there is not always fire.

Accordingly, we reverse the dismissal of the section 10(b) claim and the section 20(a) claim against the company and the individual defendants; we affirm, on different grounds, the dismissal of the section 20(a) claim against the trust defendants. No costs are awarded.