**In re PERKINELMER, INC. SECURITIES LITIGATION**

**No. CIV.A.02–11314GAO.**

United States District Court, D. Massachusetts.

Sept. 30, 2003.

Andrew L. Barroway, Esq., Schiffrin & Craig, Ltd, Bala Cynwyd, PA, for Kevin Hatch, Plaintiff.

Michael G. Bongiomo, Esq., Beth E. Bookwalter, Esq., Jeffrey B. Rudman, Esq., Hale & Dorr, LLP, Boston, MA, for PerkinElmer Inc., Gregory L. Summe, Robert F. Friel, Defendants.

Nancy F. Gans, Moulton & Gans, PC, Boston, MA, for Kevin Hatch, Sarasota Firefighters Pension Fund, Plaintiffs.

Deborah R. Gross, Esq., Law Office of Bernard M. Gross, PC, Philadelphia, PA, for Kevin Hatch, Plaintiff.

Daniel Krasner, Esq., Wolf, Haldenstein, Adler, Freeman & Herz, New York, NY, for Kevin Hatch, Plaintiff.

David Pastor, Esq., Gilman and Pastor, LLP, Saugus, MA, for Steven P. Kadner, Movant.

Steven G. Schulman, Esq., Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, for Kevin Hatch, Plaintiff.

Thomas G. Shapiro, Shapiro, Haber & Urmy, LLP, Boston, MA, for MBC Fund Inc., Youngman Family Grp, Movants.

### MEMORANDUM AND ORDER

O'TOOLE, District Judge.

The plaintiffs bring this securities fraud suit against PerkinElmer, Inc., and two of its senior executives alleging that the defendants' public statements intentionally

misled stock purchasers who bought PerkinElmer stock between July 15, 2001 and April 11, 2002. The defendants now move to dismiss arguing that, even if assumed to be true, the allegations in the complaint do not establish that the defendants made any material misrepresentations or that they acted with the requisite level of scienter. After a careful review of the complaint, I conclude that its factual allegations are adequate to satisfy the heightened pleading requirements imposed by the Private Securities Litigation Reform Act ("PSLRA"), and accordingly the defendants' motion to dismiss must be denied.

A. *Summary of Facts*

The essential allegations in the plaintiffs' complaint are as follows. PerkinElmer is a diversified technology company which maintains its principal executive offices in Wellesley, Massachusetts. Its stock trades on the New York Stock Exchange under the symbol "PKI." PerkinElmer's business consists of four central divisions: Life Sciences, Analytical Instruments, Optoelectronics, and Fluid Sciences. Particularly important to this litigation is the Optoelectronics division (also referred to as the Optoelectronics unit) which sells specialty lighting and sensor systems for industrial applications, medical systems, and telecommunications equipment, and which gave rise to 27% of PerkinElmer's 2001 revenues. Optoelectronics is divided into three business segments, one of which is Digital Imaging, which accounts for 24% of Optoelectronics' revenue. Among the Digital Imaging unit's products are digital x-ray panels which it sells to the General Electric Company.

According to the complaint, PerkinElmer made material misrepresentations about the company's value and prospects when it announced its earnings for the second quarter of 2001. On July 15, 2001,

PerkinElmer announced that its net income had increased by 34%. Gregory L. Summe, PerkinElmer's Chairman and CEO stated, "Aggressive actions starting earlier in the year are allowing us to deliver our financial commitments in spite of this difficult economic environment." *Consolidated Am. Compl.* ¶ 26. This July 15 press release also disclosed that PerkinElmer intended to acquire Packard BioScience, a Connecticut company selling drug discovery tools.

The day after the July 15 press release, PerkinElmer hosted a conference call for analysts, money and portfolio managers, large PerkinElmer shareholders, brokers, and stock traders. During the conference call, Summe again extolled PerkinElmer's successes. Robert F. Friel, PerkinElmer's Chief Financial Officer and Senior Vice President, stated during the call that:

> Overall, we are very pleased with our results for the second quarter. In the midst of a very difficult business environment, we have once again exceeded our earnings commitment, making this the 15th consecutive quarter we have achieved doubledigit earnings per share growth. Our ability to achieve these results is due to improving portfolio businesses, our relentless focus on improving our operations and an aggressive approach to quality control.
>
> . . . .
>
> Now turning to Optoelectronics, revenue was 108 million, with 20 percent-plus growth in telecom and digital imaging offset by softness in photography and semiconductor markets, yielding an overall organic decline of six percent.
>
> . . . .
>
> The Digital Imaging business continues to perform well, with revenues up over 20 percent in the quarter. We recently produced our 100th (raz) panel and

shipped our first cardiac panel to (GE Med Systems) . . . .

*Id.* ¶ 32. After this information was announced, stock analysts rated PerkinElmer stock a "Strong Buy." By July 27, 2001, PerkinElmer's stock price had climbed to $34.48 per share from $27.93 per share on July 16.

On August 1, the company issued a press release bearing the heading, "PerkinElmer Launches Volume Production of Digital Cardiac Flat Panel X–Ray Detectors for GE Medical Systems, First Deliveries in Q2 2001." *Id.* ¶ 36. The press release went on to state that PerkinElmer had reached "another milestone in its alliance with General Electronic Medicals Systems (GEMS) in the initial production deliveries of what is expected to be the industry's first fully digital cardiac detector." *Id.* ¶ 36. The press release then explained:

The new system has the potential to replace conventional cardiac x-ray systems, based on image intensifiers, with high-resolution, digital systems based on amorphous silicon, flat panel technology.

. . . .

This revolutionary advance in the imaging of the human heart is the product of an ongoing cooperation between PerkinElmer and GEMS.

. . . .

PerkinElmer is the exclusive supplier of digital x-ray detectors to General Electric Medical Systems. The amorphous silicon cardiac detector is the engine behind the recently introduced GE Innova (TM) 2000 product, which has been called "a quantum leap forward in cardiac x-ray image quality."

*Id.* These statements can be understood as reaffirming the positive comments made by PerkinElmer representatives about Optoelectronics in July.

On August 15, 2001, PerkinElmer filed its quarterly report ("Form 10–Q") for the second quarter of 2001. In this Form 10–Q, PerkinElmer detailed the results of the Optoelectronics unit as follows:

Revenues for the second quarter were $108.0 million versus $120.9 million for the prior period, resulting in a decrease of 11%. For the first six months, revenues were $228.9 million versus $235.4 million for the prior period, resulting in a decrease of 3%. Higher revenues in telecom and digital imaging were offset by lower revenues in the photography and semiconductor markets which accounted for the decreases in both the quarter and six month periods.

. . . .

Operating profit before net nonrecurring items and goodwill and intangibles amortization for the second quarter was $20.7 million versus $19.4 million for the prior period, increasing 7%, and for the first six months was $40.9 million versus $35.0 million for the prior period, increasing 17% . . . .

*Id.* ¶ 38. The Form 10–Q thus informed the market that the digital imaging segment of Optoelectronics was realizing increased profits and that the company overall was able to grow its profits through successful business and operational strategies.

Positive reports about Optoelectronics and its new digital x-ray panels continued in October. On October 17, 2001, PerkinElmer issued a press release reporting its third quarter 2001 financial results. As to the Optoelectronics unit, the press release stated that, "The Company announced another milestone in its alliance with General Electric Medical Systems in the initial production deliveries of the industry's first fully digital cardiac detector. . . . PerkinElmer also entered into a strategic partnership with Elekta, develop-

er of cancer therapies, to supply its amorphous silicon panels for advanced imaging in cancer treatments." *Id.* ¶ 73. The release further stated that Optoelectronics was maintaining favorable operating margins even in the face of declining revenues due to "aggressive cost action." *Id.* ¶ 74.

The Packard BioScience acquisition was completed on November 13, 2001. On December 5, Summe was interviewed by a reporter from Bloomberg L.P., and was asked about the consequences of this acquisition on PerkinElmer's 2002 earnings. Summe replied that the acquisition will "take off about 10 cents" per share. *Id.* ¶ 88. However, he stated that the company would be "offsetting that through driving productivity and quality improvements throughout the business, and that's really been our strategy.... And we've offset the dilution through improving our cost productivity, and that's what allows us to still deliver to the investors a reasonable rate of return while improving the portfolio." *Id.* ¶ 73. Summe further stated that he expected "15 percent earnings growth" in 2002. *Id.*

After this announcement, PerkinElmer's stock rose to $33.50 per share by the close of trading on December 6, 2001. Around this time, a number of top ranking PerkinElmer executives sold large volumes of the company's stock. In particular, Summe and Friel both sold a large number of shares. On December 5, Summe sold 300,-000 shares at $30.04 per share, for gross proceeds of $9,012,000. *Id.* ¶ 92. On December 6, 2001, Friel sold 150,000 shares at $33.10 per share, for gross proceeds of $4,965,000. *Id.*

In January and February of 2002, the reports from PerkinElmer continued to repeat the same themes as the reports it had issued in the previous six months. The company again stated that it was implementing "aggressive cost and structural actions that position it for future growth in the high potential biomedical and telecommunications markets." *Id.* ¶ 94. In February PerkinElmer also issued a press release setting its 2002 earning guidance at $1.24–$1.26 per share. *Id.* ¶ 97.

According to the allegations in the complaint, the defendants' repeated claims regarding the company's successful cost management and the successes of the Optoelectronics unit were misleading. In particular, they allege that the digital x-ray panels did not generate as much income as the defendants claimed. Instead, the plaintiffs allege that the panels were all sold with a right to return, a right that PerkinElmer's customers often exercised because the panels were defective. The complaint charges that the defendants' "statements created the impression that the manufacturing process for the X–Ray Panels had been refined to produce workable, quality products, when, in reality, the X–Ray Panels were defective and unreliable and were being returned in droves by GE and other customers." *Id.* ¶ 41. They also allege that the company's financial statements violated Generally Accepted Accounting Principles ("GAAP") by failing to disclose the right to return and by reporting the full value of the sales with no accommodation for the return of the panels. *See id.* ¶¶ 50–72. The plaintiffs base these allegations in part on information they received from two confidential witnesses: a former document control specialist who worked at PerkinElmer's Santa Clara Optoelectronics facility, and the former North American sales manager who at times also worked in the Santa Clara facility. *Id.* ¶¶ 43, 46.

According to the plaintiffs, in March 2002, the market began to learn that the Optoelectronics unit was not as promising as it had been led to believe because PerkinElmer announced that it would reorga-

nize the unit. In a press release, PerkinElmer announced that the reorganization would result in a charge to first quarter 2002 earnings. This announcement was followed by a drop in the stock price to $15.75 per share. On April 11, 2002, PerkinElmer issued another press release announcing that earnings per share would be breakeven. The press release stated that the shortfall in earnings was primarily due to:

> weakness in [the] Optoelectronics end markets, the deferral of capital spending by Analytical Instruments and Life Sciences customers, and sales force integration activities related to the merger with Packard BioSciences. The company projects cash EPS for the first quarter of 2002 of approximately breakeven, as a result of an operating loss in the Optoelectronics business. These results exclude any asset write-down or restructuring charges.

*Id.* ¶ 108. In response to this news, the price of PerkinElmer's stock dropped to $12.01 by the close of April 11. On April 25, PerkinElmer announced its financial results for the first quarter of 2002 and reported that it took a charge of $23.5 million to write down Optoelectronics' inventory. *Id.* ¶ 111. The market's severe reaction to the negative information about the Optoelectronics unit, the plaintiffs argue, supports their claim that the defendants misled the market into believing that the x-ray panels were a promising new product and when the truth began to emerge, it caused a significant drop in the stock's value.

### B. *Applicable Legal Standards*

As with all motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must assume that the specific allegations in the complaint are true, and must draw all inferences in the plaintiffs' favor. *See Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 78 (1st Cir.2002) (securities fraud claims subject to the same standard of review for a motion to dismiss as other civil claims and court "must draw all reasonable inferences ... in the plaintiff's favor"). The defendants are entitled to judgment only if the facts alleged in the complaint are legally insufficient to make out a claim of securities fraud. The inquiry must stay focused on the allegations in the complaint; the plaintiffs are not required at this stage to support their claims with detailed evidence. *See In re Cabletron Sys., Inc.,* 311 F.3d 11, 33 (1st Cir. 2002) (stating that "the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence").

To establish a valid claim of securities fraud, the plaintiffs first must allege that the defendants made materially misleading statements. A statement is materially misleading if it is false or if it omits pertinent information in a manner that renders the statement misleading. *See* 15 U.S.C. § 78u–4(b)(1) (defendant is liable if he "(A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading."). Allegations of misleading statements must be made with particularity. In the complaint, the plaintiff must set forth, "each allegedly misleading statement or omission, including its time, place and content." *Aldridge,* 284 F.3d at 78 (citation and internal quotation omitted). *See also,* 15 U.S.C. § 78u–4(b)(1). The plaintiff also "must provide factual support for the claim that the statements or omissions were fraudulent, that is, facts that show exactly why the statements or omissions were misleading." *Aldridge,* 284 F.3d at 78.

A plaintiff generally cannot build a successful fraud claim on "loosely optimistic statements" or "puffery." *See Shaw v.*

*Digital Equip. Corp.,* 82 F.3d 1194, 1217–18 (1st Cir.1996) (securities fraud claim cannot rest on "overly-optimistic statements" that are nothing more than "self-directed corporate puffery"). This is particularly true in a case (like this one) based on a "fraud-on-the-market" theory. Under this theory, "the statements identified by plaintiffs as actionably misleading are alleged to have caused injury, if at all, not through the plaintiffs' direct reliance upon them, but by dint of the statements' inflating effect on the market price of the security purchased." *Id.* at 1218. *See also Basic Inc. v. Levinson,* 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (accepting and explaining the fraud-on-the-market theory). Because the relevant audience in a fraud-on-the-market case is the entire marketplace, not any specific investor, statements that "any reasonable investor (ergo, the market)" would dismiss as too vague cannot support a fraud claim. *Shaw,* 82 F.3d at 1218.

A genuinely misleading statement is material and actionable if it "would have assumed actual significance in the deliberations of a reasonable shareholder." *In re Cabletron Sys., Inc.,* 311 F.3d at 34 (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). When the plaintiff alleges that the defendant's statements were misleading due to the omission of relevant information, he must show that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC. Indus.,* 426 U.S. at 449, 96 S.Ct. 2126. The materiality of a given statement or omission "is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss." *In re Cabletron,* 311 F.3d at 34.

In addition to adequately alleging a material misrepresentation, the complaint must set forth sufficient facts to raise a "strong" inference of scienter. 15 U.S.C. § 78u–4(b)(2). In other words, the plaintiff must allege with sufficient particularity that the defendant acted with the intent to deceive, manipulate, or defraud shareholders. *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 194 (1st Cir.1999). A complaint generally does not meet this standard if it merely pleads that the defendants had the motive and the opportunity to deceive. *See id.* at 197 ("Merely pleading motive and opportunity, regardless of the strength of the inferences to be drawn of scienter, is not enough."). Instead, plaintiffs usually must allege "some additional misconduct" to survive a motion to dismiss. *Geffon v. Micrion Corp.,* 249 F.3d 29, 36 (1st Cir.2001).

The First Circuit has recently said that on a motion to dismiss the court's responsibility is to "review the complaint only to determine that it pleads the existence of [misleading] statements and presents a plausible jury question of materiality." *In re Cabletron,* 311 F.3d at 34.

C. *The Adequacy of the Consolidated Amended Complaint*

■ Succinctly put, the plaintiffs allege that the defendants' statements spotlighting the successes of the Optoelectronics unit, and its new x-ray panels, inflated the price of PerkinElmer's stock. The plaintiffs allege that these statements were fraudulent because they failed to disclose information known to the defendants indicating that the x-ray panels manufactured and sold were often defective, and further because the company's reported revenues improperly included income from sales of the defective panels, even though many of those sales were later reversed as the result of returns.

The defendants argue that these allegations, even if true, do not adequately plead a material misrepresentation of fact. This argument raises two distinct issues: (1) whether the defendants' statements about Optoelectronics and the x-ray panels could be found to be material, that is, having significance to a reasonable investor, and (2) whether the plaintiffs have adequately alleged that the statements were false or misleadingly incomplete.

As to the first issue, the plaintiffs have sufficiently alleged that the statements could be of material significance to a reasonable investor. PerkinElmer's repeated reference to the Optoelectronics unit and specifically to the x-ray panels in its press releases permits the inference that PerkinElmer used the unit and the product to justify an optimistic forecast for the company's earnings potential. Even though the x-ray panels may not have constituted a significant portion of the company's current profits, it would be reasonable for an investor to consider the company's potential future earnings in making decisions about whether to buy or sell the company's stock.

As to the second issue, the plaintiffs adequately allege that the defendants made materially false statements about the company's current profits by failing to inform the market that sales of this promising product cited by defendants in its statement were subject to a right of return and that the right was being frequently invoked by the company's customers. A reasonable investor might have considered the existence of such a right and its regular exercise important factors in evaluating the company's business.

The allegations in this case are similar to those in *Aldridge,* a recent First Circuit decision in which the court held that the plaintiff had adequately pled a securities fraud claim. In *Aldridge,* the defendant, A.T. Cross Corporation told the market that its new product, the "CrossPad," was projected to increase considerably the company's profitability in the near future. *See Aldridge,* 284 F.3d at 76. However, the company failed to disclose that its sales of the CrossPad were contingent, because its customers had a right to return the CrossPads if they (in turn) could not sell them to retail buyers. *See id.* at 79–81. The court concluded that the company's failure to disclose this information in its statements to the public supported the inference that the company's "statements were misleading and that the defendants knew that they were misleading." *Id.* at 79.

The plaintiffs in this case similarly allege that the defendants created a false impression about the current and future profitability of the x-ray panels by telling the market that it had successfully begun producing and selling the panels, without mentioning that numerous panels had been returned because of defects. They also allege that the company improperly included the revenues from these sales in its income statements without indicating that the sales all carried a right to return which was frequently exercised. Since the Optoelectronics unit and the x-ray panels were spotlighted in numerous public statements about the company's current earnings and its future potential, it could reasonably be inferred that omitting negative information about the panels from those statements would have been materially misleading. *See also Lucia v. Prospect Street High Income Portfolio, Inc.,* 36 F.3d 170, 176 (1st Cir.1994) (defendant's decision to report only the rosy ten-year comparison between Treasury securities and junk bonds and to omit mention of a less favorable six-year comparison raised issue of fact regarding materiality). While this conclusion may be debatable, at this stage,

the complaint presents a plausible factual inference of materiality.

The concept of "materiality" is not necessarily tied to a specific fraction of a company's profits, and the fact that a misrepresentation pertained to a relatively small portion of the company's business does not automatically establish that the misrepresentation was not material. As the Second Circuit has held, there is no "formulaic approach to assessing the materiality of an alleged misrepresentation." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir.2000). Materiality requires assessment of qualitative and quantitative factors, so that even quantitatively small amounts can still present a materially misleading picture of a company's health. *See id.* at 163 (citing SEC Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150, 45152 (1999)). Therefore, the mere fact that the x-ray panels only accounted for a small portion of PerkinElmer's net profits in the second and third quarters of 2001, does not mean that the defendants are necessarily absolved from liability for any misleading statements they made about the subject. This is particularly true here where it is alleged that the company chose to feature the x-ray panels in several of its press releases during the relevant period.

· The complaint also offers a sufficiently detailed set of allegations to support its claim that PerkinElmer's statements about the success of the x-ray panels and the Optoelectronics unit were false or misleading. As noted above, the plaintiffs allege that the following information was wrongfully withheld from the market: (1) significant numbers of the x-ray panels sold were defective, (2) these panels were shipped with a right to return, and (3) many buyers were exercising the option to return the panels. The complaint further alleges that former employees of PerkinElmer have supplied relevant information concerning these matters (and presumably would testify to that information at a trial). One former employee has told the plaintiffs that PerkinElmer would bill customers for the panels upon shipment, taking the sale price (about $100,000 each) into income. This person has also stated that PerkinElmer's chief customer, GE, regularly returned defective x-ray panels and had returned at least forty panels by the end of 2001, amounting to a return rate, according to the complaint, of about 40%. A second former employee, the company's former North American sales manager, has also stated that customers other than GE also returned panels after they were billed for them. While a 40% return rate might not be significant if it related to a minor product with little effect on the company's overall financial health, it is alleged here that the product being returned so frequently was the very product the company was touting as a reason for being optimistic about the growth prospects of its Optoelectronics division.

An inference of materiality might also be drawn from the fact that in 2002 PerkinElmer decided to reorganize the Optoelectronics unit, resulting in a $23.5 million charge in the first quarter of 2002 to write down Optoelectronics' inventory. That fact might support an inference that the Optoelectronics division was not in fact doing as well as the defendants claimed in the third and fourth quarter of 2001.

■ The defendants' argument that the complaint fails to state facts adequate to give rise to a strong inference of scienter must also be rejected. The claim that the defendants knew that the statements were false is supported by a number of specific factual allegations. First, the complaint alleges that both of the individual defendants, Summe and Friel, held positions that would have given them not only ac-

cess to, but close familiarity with, the details of PerkinElmer's affairs. Summe was the company's Chief Executive Officer, President, and Chairman of the Board. Friel was the company's Chief Financial Officer and Senior Vice President. Both defendants personally made a number of the statements that the plaintiffs are alleging are false, and Friel signed some of the financial reports the company issued during the class period. Furthermore, the former North American sales manager has reported that PerkinElmer's contract to supply GE with x-ray panels was a "house account" that Summe himself handled personally.

An inference of scienter is also supported by the allegation that the two individual defendants both sold substantial blocks of stock during the period when, according to the complaint, the problems with the Optoelectronics division were becoming increasingly apparent to them. It is alleged that in December 2001, both Friel and Summe sold a large volume of PerkinElmer stock. The plaintiffs suggest that these sizeable sales permit an inference that both defendants felt that the stock price had reached a peak that it was unlikely to surpass, making it a good time to sell company stock. The plaintiffs further allege that these sales were notable and significant because there had been no record of similar sales in the prior three years. Since they were not part of a pattern of usual trading, such as year-end tax-motivated dispositions, it is permissible, the plaintiffs say, to infer that they were motivated by some unusual reason, such as the Optoelectronics division's deteriorating financial condition and the prospect that, when that fact became known, the stock price would drop.

The plaintiffs also claim that Summe had personal financial incentives to inflate PerkinElmer's income statements. According to the complaint, Summe participated in an incentive compensation program that was linked to earnings performance. *Consolidated Am. Compl.* ¶ 134. The plaintiffs assert that these financial rewards further motivated him knowingly to permit the practice of including the sale of x-ray panels in the company's revenues, without disclosing that many of the panels would be returned and the sales recorded would later be reversed. In sum, the plaintiffs have pled sufficient facts to support a "strong" inference of scienter as to both Summe and Friel.

On both the issues of materiality and scienter, the defendants seek to introduce additional facts to diminish the inferences suggested by the complaint. For example, the defendants seek to show, contrary to what the complaint alleges, that Summe's and Friel's stock sales were part of a consistent and regular pattern of stock sales by the two. These factual issues, however, cannot be resolved on a motion to dismiss and must be left for resolution at trial, or if appropriate, on a motion for summary judgment.

### D. *Conclusion*

The complaint adequately sets forth a claim of securities fraud against the defendants. Accordingly, the defendants' motion to dismiss (docket no. 20) is DENIED.

It is SO ORDERED.