**In re LERNOUT & HAUSPIE SECURITIES LITIGATION.**

**No. Civ.A. 00–CV–11589– P (consolidated)** [1].

United States District Court, D. Massachusetts.

June 19, 2002.

---

1. On December 15, 2000, the following cases were consolidated pursuant to Fed.R.Civ.P. 42(a) to form this Consolidated Action: 00–CV–11589, 00–CV–11621, 00–CV–11622, 00–CV–11669, 00–CV–11749, 00–CV–11841, 00– CV–11880, 00–CV–12044, 00–CV–12045, 00–CV–12063, 00–CV–12548, 00–CV–12552, 00–CV–12554, 00–CV–12555, 00–CV–12561. On September 9, 2001, 01–CV–10725 was consolidated with this Consolidated Action.

Michael G. Lange, Glen DeValerio, Alicia M. Duff, Jeffrey C. Block, Berman, DeValerio & Pease, Boston, MA, Gene Cauley, Steven E. Cauley, W. Todd W. Todd Ver Weire, Curtis L. Bowman, Cauley, Geller, Bowman & Coates, Little Rock, AK, Paul J. Geller, Cauley, Geller, Bowman & Coates, Boca Raton, FL, James P. Bonner, Kenneth A. Ricken, Ralph M. Stone, Lee S. Shalov, Shalov Stone & Bonner, New York City, Robert P. Frutkin, Stuart H. Savett, Barbara A. Podell, Savett, Frutkin, Podell & Ryan, Philadelphia, PA, Bernard M. Gross, Deborah R. Gross, Law Offices of Bernard Gross, Philadelphia, PA, Thomas G. Shapiro, Shapiro, Haber & Urmy LLP, Boston, MA, Richard A. Lockridge, Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN, Lisa J. Rodriguez, Rodriguez & Richards, LLC, Haddonfield, NJ, Thomas L. Earp, Earp Cohn P.C., Westmont, NJ, Michael D. Donovan, David A. Searles, Donovan Searles, LLC, Philadelphia, PA, for plaintiffs.

William R. Moorman, Stephen Wald, Craig & Macauley, P.C., Boston, MA, Kevin J. Lesinski, Arnold P. Messing, Choate, Hall & Stewart, Boston, MA, Michael P. Carroll, William Fenrich, Diem–Suong T. Nguyen, Davis, Polk & Wardwell, New York City, Bruce G. Merritt, Debevoise & Plimpton, New York City, Sanjit S. Korde, James O. Fleckner, James S. Dittmar,

Hutchins, Wheeler & .Dittmar, Boston, MA, Michael A. Collora, David M. Osborne, Dwyer & Collora, Boston, MA, Donald Chase, Franklin R. Weissberg, David A. Piedra, Peter D. Weinstein, Morrison Cohen Singer & Weinstein, LLP, Rachelle L. DeGregory, Morrison Cohen Singer & Weinstein, LLP, New York City, William Shields, Jonathan I. Handler, Day, Berry & Howard, Boston, MA, Bruce A. Baird, Paul W. Schmidt, Jason A. Levine, William D. Iverson, Covington & Burling, Washington, DC, Andrew Good, Silverglate & Good, Boston, MA, Roger E Zuckerman, Steven M. Salky, Zuckerman Spaeder, LLP, Washington, DC, Michael P. Connolly, Murtha Cullina Roche Carens & DeGiacomo, Boston, MA, Robert J. Kaler, Gadsby & Hannah, LLP, Boston, MA, Douglas H. Meal, Ropes & Gray, Boston, MA, David H. Braff, Philip L. Graham, Jr., Bradley A. Harsch, Stephanie G. Wheeler, Sullivan & Cromwell, New York City, Theodore Edelman, Sullivan & Cromwell, London, Vincent M. Amoroso, Erik Lund, Posternak, Blankstein & Lund, Boston, MA, David N. Ellenhorn, Louis M. Solomon, Teresa A. Gonsalves, Solomon, Zauderer Ellenhorn, Frischer & Sharp, New York City, Thomas W. Evans, Janet B. Fierman, Robert M. Cohen, Cohen & Fierman, LP, Boston, MA, John W. Polk, Baker & McKenzie, Washington, DC, John A. Gilmore, Nelson Callahan, Hill & Barlow, Boston, MA, George A. Salter, John A. Redmon, Nicholas W.C. Corson, Hogan & Hartson, LLP, New York City, Sarah E. Walters, Gus P. Coldebella, Anthony M. Feeherry, Goodwin Procter, LLP, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

This securities class action alleges massive accounting fraud at now-bankrupt Lernout & Hauspie Speech Products, N.V. ("L & H"), a Belgian speech recognition software corporation once touted as the Microsoft of Europe. Lead Plaintiffs assert a fraudulent scheme involving senior officers, directors, various KPMG entities and related corporations that injured purchasers of L & H common stock and stock options on the NASDAQ stock exchange between April 28, 1998 and November 9, 2000.

The 213–page First Consolidated and Amended Complaint ("Complaint")[2] alleges that defendants overstated by 64%, and in some cases completely fabricated, L & H's revenues and earnings; engaged in a "smorgasbord of accounting irregularities"; and issued materially false and misleading statements concerning the company's financial performance—all in violation of the Generally Accepted Accounting Principles ("GAAP"). Plaintiffs further allege that L & H's outside auditors, various KPMG entities, made fraudulent accounting statements.

Plaintiffs have brought suit against 28 different defendants. Most of these defendants have moved to dismiss the Complaint on the ground that it fails to state a

---

**2.** The Complaint alleges violations of Section 10(b) against: the senior L & H officer defendants (Count I); the outside directors who sat on the L & H Audit Committee (Count II); three defendants who sold stock while in possession of material non-public information (Count IV); three L & H related entities and an individual alleged to have fraudulently subsidized customer purchases from L & H (Count V); the KPMG entities (Count VI). It also alleges violations of Section 20(a) of the Exchange Act against: the senior officer defendant, the director defendants, and the audit committee defendants (Count III); as well as two KPMG entities (Count VII). Finally, it alleges respondeat superior liability against two corporations which had exercised their power to appoint members of the L & H Board (Count VIII).

claim under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67 (1995) (codified at 15 U.S.C. § 78u–4 & –5). To address the multiple motions to dismiss, this Court divided the defendants into functional groups, beginning with the "Senior Officers": Jozef Lernout, Pol Hauspie, Gaston Bastiaens, and Nico Willaert.[3] After hearing on April 24, 2002, and a review of the extensive briefing, the Senior Officers' Motions to Dismiss are *DENIED.* The Court also *DENIES* the Motion to Dismiss on the ground of forum non conveniens filed by defendants Hauspie and Willaert.

## I. BACKGROUND

Unless otherwise noted, the facts recited below are drawn from the Complaint. These facts provide an outline of the allegations as they relate to the Senior Officers. Allegations concerning other defendants are not set forth here.

### A. *Defendants*

L & H is a Belgian corporation with its United States executive offices in Burlington, Massachusetts. L & H develops and licenses speech technologies, including speech recognition software. Prior to its Chapter 11 bankruptcy filing on November 29, 2000, L & H was listed and traded on the NASDAQ stock exchange. Plaintiffs have not named L & H as a defendant.

The three individual lead plaintiffs in this action, Quaak, Po, and Leibinger, three Europeans, purchased common stock between April 28, 1998, and November 8, 2000 (the "Class Period"). Plaintiff MM

Holdings, Inc. purchased L & H options during the Class Period.

Defendants Jozef Lernout and Pol Hauspie founded L & H in 1987. Lernout and Hauspie both served as Managing Directors of the Board and Co–Chairmen in the Office of the Chief Executive during the entire Class Period, resigning their management positions on the last day of this Period.

Defendant Gaston Bastiaens served as Chief Executive Officer starting in May 1997 and President starting in October 1996, until his resignation from both positions on August 25, 2000. Finally, defendant Nico Willaert served as Managing Director and Vice Chairman of L & H at all times relevant to the Complaint.

### B. *Material Misstatements*

Broadly grouped, plaintiffs' allegations of fraud against the Senior Officers fall into three categories: (1) the massive overstating of L & H revenues and earnings in publicly reported statements and consolidated financial results, resulting from a wide range of improper accounting practices; (2) misleading statements regarding L & H's Korean subsidiary's revenues and earnings and the concealment of its fraudulent accounting practices; and, (3) misleading statements and omissions related to the use of "strategic partner" and related company transactions.

#### 1. Financial Reports

Plaintiffs allege that L & H disseminated false and misleading financial results in the following documents:

Defendant Carl Dammekens became Acting Chief Financial Officer of L & H in 1996 and Chief Financial Officer in July 1999. He resigned as CFO on the November 9, 2000. He has defaulted.

---

**3.** The Complaint also names Ju–Chul Seo (a/k/a John Seo, Ju Cheol Suh, and Ju Cheol Sea) and Carl Dammekens as a Senior Officer defendants. Seo was the President of L & H's Korean subsidiary from September 1999 through his suspension on November 22, 2000. Seo has not appeared in this action and is believed to be a fugitive in China.

(a) Financial press releases of April 28, 1998; July 28, 1998; October 27, 1998; April 7, 1999; May 18, 1999; July 28, 1999; October 27, 1999; February 9, 2000; May 9, 2000; and, August 8, 2000;

(b) Form 6–K Reports of Foreign Private Issuer for: Q1 1998; Q2 1998; Q3 1998; Q4 1998; Q1 1999; Q2 1999; Q3 1999; and, Q1 2000;

(c) Form 10–Q Quarterly Reports for: Q3 1999; Q1 2000; and, Q2 2000;

(d) Form 10–K Annual Report for 1999; and,

(e) Form 20–F Annual Report for 1998.

The overstatements of revenue ranged from approximately $10 million in the first quarter of fiscal year 1998 to over $60 million in the second quarter of fiscal year 2000. L & H eventually restated its financial statements for 1998, 1999, and the first two quarters of 2000, essentially admitting that over $377 million of revenue had been improperly recorded between 1998 and 2000.

The Complaint alleges that L & H, in order to show these overstated revenue and earnings and inflate L & H's stock value, engaged in a panoply of fraudulent schemes. These schemes included:

(a) the recording of revenue from barter and exchange transactions on at least 7 occasions, in violation of GAAP;

(b) prematurely recognizing revenue when no contract was signed or when the terms of the contract were not finalized on at least 7 occasions, in violation of GAAP;

(c) the backdating of a licensing agreement, in violation of GAAP and internal accounting principles;

(d) the recording of revenues from contracts when L & H had reason to doubt the customer had the ability to pay for the ordered products and services on at least 6 occasions, in violation of GAAP and internal accounting principles;

(e) the recording of revenue from sales subject to contingencies on at least 4 occasions, in violation of GAAP;

(f) the recording of revenue from a licensing agreement subject to a side agreement giving the purchaser a money-back-plus-interest guarantee if the purchaser could not resell the license;

(g) the recording of revenue from sales where the customer had a right to return the purchased product and where the customer never in fact gave L & H any money, on at least 2 occasions, in violation of GAAP;

(h) the recording of revenue from "sales" in which L & H intended to reimburse the licensee in violation of GAAP; and,

(i) the knowing shipment of non-working products, in order to make year-end numbers.

### 2. *The Korean Fraud*

Plaintiffs also allege that L & H manufactured earnings and revenue overstatements through accounting irregularities and blatant fraud relating to its Korean subsidiary. L & H purchased systems-development company Bumil Information & Communications, Co. in September 1999, renaming it L & H Korea. Between September 1999 and June 30, 2000, L & H recorded nearly $160 million in licensing revenue in Korea. The plaintiffs allege that every dollar of this revenue was fictitious.

Plaintiffs essentially make three groups of allegations of wrongdoing related to the Korean subsidiary. First, plaintiffs allege that L & H Korea misrepresented its reve-

nues and cash using accounting schemes including:

 (a) the recording of the full value of large "sham" contracts with small businesses and start-ups at the close of each financial quarter, despite the fact that the contracts were subject to oral or written side agreements that altered these contracts and made it highly unlikely that the customers would pay;

 (b) the creation of an appearance of the receipt of cash through the use of "factoring arrangements," by which L & H sold the accounts receivable from licensing agreements to Korean banks. The banks would put funds in a "restricted time deposit" holding the funds until the customer paid. When the customer did not pay, the banks would take back the funds. Plaintiffs allege that defendants did so on at least 6 occasions, causing approximately $100 million in L & H Korean recorded revenue and cash to "disappear[ ] from the Company's records overnight."

 (c) the recording of revenue for license agreements despite the power of the customer to demand a refund of the prepayment fee, on at least 4 occasions, in violation of GAAP; and,

 (d) the recording of revenue for sales prior to any payments from the customer.

Second, plaintiffs detail a fraudulent "earn-out scheme" involving Seo, the sole shareholder of Bumil prior to its purchase by L & H and the President of the L & H Korean subsidiary from September 1999 to November 2000. L & H, in acquiring Bumil, agreed to pay Seo an "earn-out" of $25 million if L & H Korea met certain performance requirements after 6 financial quarters. One quarter later, Seo reported that L & H Korea had met the requirements and L & H sent him the $25 million.

Plaintiffs allege that the earn-out payment to Seo actually was part of a scheme to fund L & H Korea's improper relationship with Korean banks.

Third, plaintiffs allege, L & H publicly named as customers several securities, technology, and telecommunications companies in Korea. In actuality, L & H had few real customers in Korea and its fifteen-fold increase in revenues in one year was entirely the product of fraud.

### 3. Strategic Partner/Related Party Transactions

Plaintiffs allege that L & H, along with defendants the FLV Fund and Mercator and Noordstar NV ("Mercator"), two companies closely related to L & H and the individual defendants, set up 30 "Language Development Companies" ("LDCs") and Cross–Language Development Companies ("CLDCs"). These "strategic partners" would contract with L & H to develop L & H's software for specific applications and languages. The partners paid handsome licensing fees to L & H, which L & H recorded as revenue, despite the fact that most of the LDCs and CLDCs were owned by parties related to L & H, including FLV Fund and Mercator. L & H further compounded this ruse, plaintiffs allege, by having L & H employees perform the development work for the LDCs and CLDCs with L & H funding for research and development costs. L & H then would inflate its balance sheet by "purchasing" the strategic partner and capitalizing the majority of the purchase price as goodwill, including the amounts spent on research and development. By doing so, L & H prevented the bulk of its LDC/CLDC research expenditures from appearing on its earnings statements.

Plaintiffs allege that L & H derived substantial revenue from these "strategic partner" transactions: 10% of L & H reve-

nues in 1998 and 25% in 1999. As a result of this scheme, L & H improperly booked approximately $79 million in revenue.

## C. *Denouement*

### 1. Wall Street Journal

L & H's ostensible success story began to unravel in July 2000. Because of its acquisition of Dictaphone Corporation in May 2000, L & H had to report the geographic breakdowns of its revenues. This breakdown revealed huge revenues in Asia, including an approximately 277,000 percent increase in Singapore revenues between 1998 and 1999.

L & H's success in Asia attracted the attention of *The Wall Street Journal* ("WSJ"). In a July 2000 article concerning L & H's Asian sales, Bastiaens trumpeted L & H's successful new Asian strategy. "Strategy" proved an insufficient explanation for WSJ, which commenced an investigation of certain L & H transactions. On August 8, 2000, WSJ reported that several companies listed as customers by L & H in Asia either denied doing business with L & H or claimed that they did much less business with L & H than L & H had reported. In a press release that day, L & H said that the customer statements in the article were misquoted or incorrect.

A week later, on August 15, WSJ announced that L & H had begun a mid-year audit. On August 18, WSJ reported that Bastiaens, in an alleged attempt to bolster confidence in L & H, bought 625,000 shares of L & H stock at a premium in July.

News of an SEC investigation of L & H became public on September 21, 2000; by a L & H press release, and through a story in WSJ the following day. It was later revealed that the SEC had begun an informal investigation of L & H in January 2000, and in April 2000 had begun informally investigating KPMG Belgium's in-volvement in L & H. The SEC launched a formal investigation in late August or early September 2000.

At the same time news of the investigation hit the stands, the WSJ began to raise more questions about L & H's Asian transactions, and the transactions it reported with the FLV Fund. The Brussels-based EASDAQ, the European stock exchange, launched a formal investigation of L & H on or about September 26, 2000. L & H, particularly via Lernout, vehemently denied any inaccuracies in the L & H financial reports and outlook. By late October, however, further revelations about L & H's related party transactions had surfaced.

### 2. Restatements & Bankruptcy

By press release dated November 9, 2000, L & H announced the restatement of its 1998, 1999, and Q1–Q2 2000 financial statements because of accounting "errors and irregularities." L & H also reduced its third quarter 2000 revenue estimates by $40 million. Lernout and Hauspie then resigned as executive co-chairs; Willaert stepped down as Managing Director.

Following the announcement of L & H's intention to restate two-and-a-half years of revenues, both NASDAQ and EASDAQ suspended trading in L & H stock. This stock eventually fell below $1 per share, from its March 2000 high of $65.

Later in November, KPMG withdrew both its 1998 and 1999 audit reports, stating that the reports should no longer be relied upon. At approximately the same time, L & H announced the resignation of Hauspie and two other individuals as L & H Directors, as well as the removal of Seo as President and General Manager of L & H Korea.

On November 29, 2000, L & H filed for bankruptcy under Chapter 11, following its

discovery that over $100 million was missing from its Korean unit.

### 3. Audit Committee

L & H revealed the November 20th report of its Audit Committee on December 19, 2000. The report detailed numerous accounting irregularities in the 1998 and 1999 revenue statements. It also disclosed an inability to obtain or confirm information regarding L. & H's related-party and Korean transactions. The Audit Committee concluded that approximately $277 million was improperly recorded during the Q1 1998 – Q2 2000 period. The report recommended that L & H reverse all $182 million in Korean revenue and investigate further the recognition of revenue from 24 of the 30 "strategic partner" transactions. Finally, disciplinary action was suggested for Lernout, Hauspie, Willaert, Bastiaens, and Dammekens.

### 4. Arrests

By December, L & H's new management stated that there was strong evidence of deceptive and questionable accounting practices at L & H. On January 5, 2001, a Belgian bankruptcy judge agreed, declaring that there was no doubt there was fraud at L & H. According to plaintiffs, the true magnitude of that fraud became apparent on April 27, 2001, when L & H disclosed that revenues had been overstated by $373 million, approximately $100 million more than the Audit Committee report had found.

That same day, Lernout, Hauspie, and Willaert were arrested in Belgium and charged with forgery and stock manipulation. Korean investigators began looking into the activities of Seo and several other L & H Korea executives and employees, as well as four South Korean banks. A month later, Bastiaens was arrested in the United States and extradited to Belgium to face charges of fraud, insider trading, stock market manipulation, and accounting law violations.

## II. LEGAL ANALYSIS

### A. *Legal Standards*

#### 1. Motion to Dismiss Standard

A court may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 988 (1st Cir.1992); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir.2002) ("Although the pleading requirements under the PSLRA are strict ... they do not change the standard of review for a motion to dismiss.").

#### 2. Rule 9(b) and the PSLRA

Under § 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, it is unlawful for any person, directly or indirectly, to commit fraud in connection with the purchase or sale of securities. *See* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5. "[P]laintiff must plead ... that the defendant made a false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this statement or omission caused the plaintiff's injury." *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996).

Since this securities action is a claim sounding in fraud, it is subject to the heightened pleading requirements of Fed. R.Civ.P. 9(b). *See Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir.1997). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting

fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The particularity requirement of Rule 9(b) serves three primary purposes: "(1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations." *New England Data Servs., Inc. v. Becher,* 829 F.2d 286, 289 (1st Cir.1987).

The First Circuit has been "especially strict in demanding adherence to Rule 9(b) in the securities context...." *Gross,* 93 F.3d at 991. Where an allegation of fraud is based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief. *See Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991). In short, a claim of fraud must "set forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1223–24 (1st Cir.1996) (citations omitted).

The PSLRA erects additional pleading hurdles by requiring that the plaintiff's complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); *see also Aldridge,* 284 F.3d at 78. In order to allege scienter adequately under the PSLRA, the complaint must, with respect to each allegedly fraudulent act or omission, "state with particularity facts giving rise to a strong inference that the defen-

dant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

Accordingly, under the PSLRA and Rule 9(b) case law, a mere *reasonable* inference of scienter is insufficient to survive a motion to dismiss: the inference must be both *reasonable* and *strong*. *See Aldridge,* 284 F.3d at 78 (citing *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196–97 (1st Cir.1999)). Determining whether the complaint's allegations raise a strong inference of scienter requires a fact-specific approach, and the plaintiff is not bound to follow any precise pattern or method of establishing unlawful intent. *See Greebel,* 194 F.3d at 195–96; *accord Helwig v. Vencor, Inc.,* 251 F.3d 540, 551–52 (6th Cir. 2001) (en banc) ("Because Congress did not endorse or prohibit a particular manner of pleading, we cannot disregard any set of facts as insufficient as a matter of law.").

The burden lies with the plaintiff to "show that his characterization of the events and circumstances as showing scienter is highly likely." *Aldridge,* 284 F.3d at 82. But inferences need not be irrefutable. *See id.* "Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder." *Id.* (quoting *Helwig,* 251 F.3d at 553).

## B. *Sufficiency of Factual Allegations*

The individual defendants proclaim that the plaintiffs' 213–page Complaint fails to sufficiently plead that the individual defendants were in fact responsible for the specific misstatements. Plaintiffs contend that the Complaint alleges a series of specific statements, defendant-signed documents, statements issued on behalf of L & H, material omissions, and manipulative and deceptive practices sufficient to meet the pleading requirements for each defendant.

### 1. Accounting Misstatements

██ Each defendant may be held responsible for the false and misleading statements contained in the financial statements he signed. *See Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 367–68 (1st Cir.1994) ("The acceptance of responsibility for the contents of the Annual Report, demonstrated by defendants' signatures, combined with specific allegations that they knew of conflicting conditions, established a sufficient link between the defendants and the alleged fraud to satisfy Rule 9(b)'s particularity requirement."); *In re Raytheon Sec. Litig.*, 157 F.Supp.2d 131, 152 (D.Mass.2001) (citing *Serabian*, 24 F.3d at 367–68).

Each of the four individual defendants signed the 1999 Form 10–K, which allegedly overflowed with false financial information. (¶ 92). For example, the 1999 Form 10–K overstated fourth quarter revenues and accounts receivables by at least $65.6 million and year-end 1999 revenues and accounts receivables by $174.7 million. (¶ 93). Bastiaens also signed several of the Form 6–Ks and the Q1 and Q2 2000 Form 10–Qs, all of which contained false and misleading statements. (¶¶ 67, 70, 76–77, 85, 98, 101). These signatures link each of the defendant senior officers to the alleged fraud, satisfying the factual allegations requirement under the PSLRA and Rule 9(b).

██ Each of the four individual defendants also may be held responsible for the false and misleading information contained in group-published information. "Under the group-published information doctrine, the plaintiff may impute false or misleading statements conveyed in annual reports, quarterly and year-end financial results, or other group-published information to corporate officers." *Raytheon*, 157 F.Supp.2d at 152; *accord In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 318 (E.D.N.Y. 2002); *In re JDN Realty Corp. Sec. Litig.*, 182 F.Supp.2d 1230, 1250 & n. 11 (N.D.Ga. 2002) (collecting cases); *In re Adaptive Broadband Sec. Litig.*, No. 01–1092 SC, 2002 WL 989478, slip op. at *16 (N.D.Cal. Apr. 2, 2002).[4] This doctrine does not, however, obviate the requirement that a court evaluate separately the allegations concerning the scienter of each of the individual defendants.

To hold defendants responsible for the group-published information, the plaintiffs must sufficiently allege that each individual defendant is a "clearly cognizable corporate insider[ ] with [an] active daily role[ ] in the relevant companies or transactions." *Raytheon,* 157 F.Supp.2d at 152 (citing *Polar Int'l Brokerage Corp. v. Reeve,* 108 F.Supp.2d 225, 238 (S.D.N.Y. 2000)). The Complaint sufficiently establishes that each of the four individual defendants was a high-ranking officer of the company. (¶¶ 23, 242 (Lernout); ¶ 24 (Hauspie); ¶¶ 25, 460 (Bastiaens); ¶ 28, 460 (Willaert); ¶¶ 54, 56, 384(c) (regarding roles and responsibilities of Senior Officers and Directors)). Plaintiffs also make several allegations demonstrating the individual directors' "active daily roles" in L & H's financial dealings. (¶ 251 (discussion of new contracts at Board meeting); ¶ 113 (defendants receive various e-mails regarding contracts); ¶¶ 114, 126–29 (Hauspie's involvement in improper contracting); ¶¶ 300–304 (Bastiaens gets letter regarding specifics of

---

4. *See also Tracinda Corp. v. DaimlerChrysler AG,* 197 F.Supp.2d 42 (D.Del.2002) (stating that a majority of district courts have affirmed vitality of group pleading after PSLRA and recognizing a split within the Third Circuit, but declining to address the issue). *But see In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 902 n. 45 (S.D.Tex.2001) (setting forth debate among district courts as to whether group pleading survived the PSLRA, and concluding that it did not).

accounting transactions)). Each of the individual defendants is consequently responsible for L & H's group-published information, including the SEC filings and press releases detailed in the Complaint.

In sum, the Complaint makes factual allegations hooking each of the individual defendants to financial misrepresentations sufficient to satisfy this portion of the pleading requirements.

### 2. Korean Fraud

■ Plaintiffs allege that the individual defendants are responsible for false and misleading information regarding L & H Korea that is contained in the financial statements described above, particularly the 1999 Form 10–K signed by each of the defendants.

In addition, Lernout, Bastiaens, and Hauspie individually made allegedly false and misleading statements regarding the Korean ventures. As part of a broader statement regarding the company's strategy and results in the August 8, 2000 press release, Lernout stated, "We also had numerous solutions sales in Asia. We believe these achievements can serve as a model for additional growth in the U.S. and Europe." (¶ 100).

From September 1999 through the end of the Class Period, Bastiaens touted L & H's successes in the Korean market and credited L & H's strategy for those successes. (¶¶ 142, 146, 148, 149). He specifically cited the company's (fictitious) $68 million positive cash flow (¶ 149) and its large client base inherited from Bumil (¶ 411). Upon questioning from *The Wall Street Journal*, he listed the names of "about a dozen Korean customers." (¶ 413). When several of those "customers" denied involvement with L & H, Bastiaens first tried to characterize them as "indirect" customers (*id.*), and then tried to deny the veracity of the story in a company press release. (¶ 415).

Hauspie made specific statements regarding L & H's expected sales in Asia. (¶ 147). In a press article on January 31, 2000, Hauspie states, "We are optimistic about the market here [Singapore] as we predict to make approximately half a billion this year, with a third of our revenues coming from Asia." (*Id.*). Contrary to Hauspie's assertion, this statement is not a mere statement of optimism, because it contains a specific estimate of the company's upcoming Asian sales that plaintiffs allege was false when made. *See In re Boston Tech., Inc. Sec. Litig.*, 8 F.Supp.2d 43, 61 (D.Mass.1998) ("Predicting specific levels of growth rate may be actionable under Rule 10b–5").

■ In addition, several publicly distributed L & H statements specifically discuss L & H's Korean activities and contain allegedly false and misleading information. The group pleading doctrine is of questionable applicability to the alleged Korean fraud, however, because of the lack of allegations concerning the individual defendants' daily personal involvement in Korean affairs. The Court therefore declines to apply the group pleading doctrine with respect to statements regarding the Korean operations.

### 3. Strategic Partners

■ The individual defendants may be held responsible for the group-published information regarding the "strategic partners." (¶¶ 189, 190, 192, 195). These statements include utter falsities according to the complaint. For example, in the 1998 Annual Report on Form 20–F, L & H stated that it had "exclusively licensed . . . to strategic partners *that are unaffiliated with us* to develop and localize our technology for specified new languages." (¶ 190) (emphasis added). The company's alleged material misrepresentations in the 1998 and 1999 annual reports understating the

portion of its revenues from related-party transactions (from FLV Fund and L & H Investment Co.) also may be charged to the individual defendants under the group pleading doctrine. (¶ 200).

## C. *Scienter*

The true battleground is, of course, whether the Complaint sufficiently alleges scienter for each of the individual defendants.

Plaintiffs in a securities fraud case must make factual allegations sufficient to show a "mental state embracing intent to deceive, manipulate, or defraud." *Aldridge,* 284 F.3d at 82 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). A complaint may meet this requirement by showing conduct that amounts to recklessness. The First Circuit has defined recklessness as:

> a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.

*Greebel,* 194 F.3d at 198 (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977)); *see also In re Galileo Corp. S'holders Litig.,* 127 F.Supp.2d 251, 261 (D.Mass.2001).

Recklessness "comes closer to being a lesser form of intent than merely a greater degree of ordinary negligence." *Greebel,* 194 F.3d at 199 (quoting *Hoffman v. Estabrook & Co.,* 587 F.2d 509, 516 (1st Cir. 1978)). However, "[e]ven if plaintiffs wish to prove scienter by 'recklessness,' they still must allege, with sufficient particularity, that the defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Maldonado v. Dominguez,* 137 F.3d 1, 9 n. 4 (1st Cir.1998); *see also In re PLC Sys., Inc.,* 41 F.Supp.2d 106, 114 (D.Mass.1999).

### 1. Scienter Concerning the Accounting Allegations

 Defendants vehemently contend that plaintiffs plead insufficient facts to create a strong inference of scienter for each of the four individual defendants.

Defendants protest too much that they fully relied, and were entitled to rely, on L & H's auditors, various arms of KPMG. They claim that the Complaint's allegations of KPMG's intimate involvement with the preparation of L & H's financial statement negated the inference of scienter. Not so. This Court may not, on a motion to dismiss, credit defendants' assertions that they were uninvolved with the preparation of financial statements in light of the Complaint's numerous allegations to the contrary. The Complaint alleges that defendants discussed the company's financial statements (including revenue recognition items), met with KPMG representatives regarding L & H's financial statements, and regularly received updates from the Audit Committee. (¶ 56 ¶ 113, ¶ 242 (Lernout states KPMG "assisted us in drawing up the books"), ¶ 243 (KPMG worked with L & H to prepare financial statements), ¶ 251, ¶ 288 (KPMG relying on L & H internal controls), ¶ 300 ("KPMG generally purported to only perform 'review' procedures....")). The Complaint includes KPMG Belgium's disclaimer that the "consolidated financial statements are the responsibility of the Company's management." (¶¶ 79, 94). In addition, the Complaint clearly alleges that L & H management sometimes ignored KPMG's advice, including its requests for adjustments. (¶¶ 271–273 (scope limitation imposed by

L & H management regarding LDCs), ¶¶ 302–303 (KPMG's requests for adjustments to be made prior to Q2 press release)).

Plaintiffs also quote former L & H employees, who state that improper accounting practices were encouraged by senior management and that these practices were discussed during meetings in Bastiaens' office. (¶¶ 5, 108, 135, 136). Such allegations add to the inference of scienter. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1273 (N.D.Cal.2000) (complaint's allegations of substantial evidence of widespread knowledge of improper revenue recognition provides "powerful circumstantial evidence of scienter"); *In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1338 (S.D.Fla.1999) (citing complaint's allegation "that the use of the allegedly fraudulent accounting practices to manipulate financial results was common knowledge" as evidence of scienter).

The Complaint also provides substantial overall allegations of scienter applicable to each of the defendants. Considered together, the violations of GAAP in the financial statements and the sheer magnitude of those overstatements contribute much to a strong inference of scienter. *See Raytheon*, 157 F.Supp.2d at 147–48 (GAAP violations combined with large accounting overstatements may provide strong inference of scienter); *see also McKesson*, 126 F.Supp.2d at 1273 ("[W]hen significant GAAP violations are described with particularity . . . they may provide powerful indirect evidence of scienter. After all, the books do not cook themselves."); *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 234 (D.Mass.1999). Revenues for FY 1999 were overstated by 103%, and for the first two quarters of FY 2000, by 81%. (¶ 313).

The Complaint alleges instances strongly suggesting that each defendant had information that conflicted with the press releases and financial statements for which he was responsible. These allegations are detailed below.

**a. Lernout**

Lernout sent an e-mail to Hauspie and Bastiaens on July 7, 1999 indicating that a $3 million contract with I–Medical purportedly reached the last day of the quarter had not been signed. (¶ 113(b)). On two other occasions, both immediately following the close of a financial quarter, Lernout received e-mails that large contracts were not signed. (¶¶ 113(e) (T.I.B. transaction), 113(g) (European Language Center transaction)).

From these e-mails, this Court finds it reasonable to infer that Lernout exercised enough oversight in the period following the close of a financial quarter to know which contracts were not fully executed. In the I–Medical transaction he alerted other L & H officers that the unsigned contract might be a problem. (¶ 113(b)). In the other two e-mails, L & H's legal counsel alerted him that the contracts were not signed. (¶ 113(e), (g)).

Plaintiffs also allege that Lernout, through an entity he funded, gave $500,000 to one of L & H's Belgian customers. This customer then gave it to L & H as a "licensing fee" and L & H booked the amount as revenue. Plaintiffs contend, based on the Audit Committee Report's characterization, that this $500,000 payment constituted an equity infusion by Lernout, and not a revenue generating transaction. (¶ 134).

**b. Hauspie**

Plaintiffs make extremely strong allegations of Hauspie's scienter. Hauspie is alleged to have forced a customer to backdate a license agreement with L & H, or face losing L & H funding, so that the

revenue from that contract could be recognized. (¶ 114).

Hauspie also received a seat on a customer's board as a result of an allegedly improper transaction. In 1998, L & H and LHIC, a company owned by defendants Lernout and Hauspie, funded loans to Vasco Data Security International ("Vasco") for purchase of L & H licenses. L & H then recognized the revenue from those transactions, despite the fact L & H's internal accounting policies mandated that L & H wait for the repayment of the loans before recognizing the revenue. (¶¶ 115, 116). *See Raytheon*, 157 F.Supp.2d at 147 (stating that violation of internal accounting policies may add to the inference of scienter). As a result of the loans, LHIC received a seat on the Vasco Board. (¶ 115). This seat was filled by Hauspie. (*Id.*)

Hauspie also allegedly signed a side agreement to a transaction with Capital Union, giving that company a right to a refund of the license fee plus interest if two of L & H's to-be-created LDC partners did not refund the fee to Capital Union first. (¶¶ 126–129). This $8 million loan transaction was recognized as revenue by L & H in Q4 1999, constituting 7.2% of L & H's revenue for that quarter. (¶ 91).

Finally, Hauspie received e-mails regarding the I–Medical and T.I.B. transactions. (¶ 113(b),(e)) and provided funding for the $500,000 equity infusion described above. (¶ 134).

#### c. Bastiaens

Bastiaens received e-mails on both the I–Medical and European Language Center transactions. (¶ 113(b), (g)). He also signed a January 1999 agreement for which the revenue was improperly recognized in the third and fourth· quarters of 1998. (¶ 110(c)). Perhaps most significant, in July 1999, KPMG alerted Bastiaens about several revenue recognition issues,

requesting that Bastiaens make revenue recognition adjustments prior to the issuance of the second quarter press release. (¶ 300–304). These adjustments were not made.

#### d. Willaert

Willaert also received several e-mails immediately following the close of financial quarters regarding unsigned contracts. In addition to being alerted about the $8 million European Language Center transaction (¶ 113(g)), L & H's legal counsel alerted Willaert of problems with a $4 million Armenian LDC transaction and a $4 million I–Travel transaction at the close of Q4 1999. (¶ 113(d), (f)). Willaert also signed the side letter for the Capital Union transaction. (¶¶ 126–129).

### 2. Korean Fraud

■ Plaintiffs point to various allegations as supporting a reasonable inference of the individual defendants' scienter with regard to L & H's Korean activities. From the start, L & H senior management knew of internal control concerns at L & H Korea. On September 9, 1999, during L & H's acquisition of the Korean entity, Bastiaens received an e-mail concerning the "financial accountability of L & H Korea" which characterized as "impossible" L & H Korea's ability to adhere to proper financial accounting. (¶ 143).

In addition, the alleged GAAP violations combined with the magnitude of the overstatement of revenue provide strong indications of scienter. L & H restated *all* of the $189 million in L & H Korea's revenues. (¶ 152, 452). In 1998, L & H's Asian market accounted for $10 million in sales; Korean revenues were $245,000. (¶ 329). In 1999, the same market was $150 million, 43% of the company's total revenue, with Korea making up over one-third of that market. (¶¶ 150, 410). Korean revenues

totaled $62 million. (¶ 150). In the first two quarters of 2000, Korean sales jumped again, this time to a jaw-dropping $127 million. (¶ 150). *See Raytheon*, 157 F.Supp.2d at 147 (GAAP violation plus "magnitude of the accounting overstatement" can provide strong inference of scienter).

Defendants, however, claim that they had no knowledge of L & H Korea's activities, activities that made up almost twenty percent of L & H revenues in 1999 and over half of L & H revenues in the first quarter of 2000. (¶ 329). They claim they are the victim of a fraud, not the perpetrator. In light of the significant warnings and tremendous magnitude of the fraud, the allegations are sufficient to create a strong inference of scienter via recklessness. *See Greebel*, 194 F.3d at 198–99 (stating recklessness standard).

The strongest indication of scienter comes from the Complaint's allegations regarding the $25 million "earn-out" payment to Seo. Each of the individual defendants clearly knew about the payment, and knew that the target gross margin that L & H expected L & H Korea to reach after six quarters had materialized after one. (¶¶ 172–173). The L & H Board discussed and approved the payout to Seo at Bastiaens' recommendation. (¶¶ 171–172). Seo then e-mailed Lernout, Hauspie, and Willaert on February 3, 2000, to thank them for the payment. Seo stated that the $25 million allowed him to "keep [his] promise to Korean banks and those banks will rely on L & H Korea and will help us much better than before." (¶ 173). Given L & H Korea's misuse of Korean banks and the amazing (and totally fictitious) success of L & H Korea in such a short time, the strong inference here is, as plaintiffs allege, that the $25 million "was necessary to provide added funding to Korean banks and enable L & H to more aggressively pursue its factoring scheme." (¶ 174). Defendants

correctly note that Seo's statement could have many meanings. Drawing, as it must, all reasonable inferences from the allegations, this Court credits plaintiffs' interpretation as one reasonable inference.

The magnitude of the overstatement, the surprisingly early earn-out payment and Seo's e-mail, all against the backdrop of concerns about the fiscal responsibility of L & H Korea's management, combine to create a strong inference of scienter for each of the individual defendants.

### 3. Strategic–Partner/Related–Party Transactions

■ The Complaint establishes a strong inference of scienter for each of the individual defendants with regard to the strategic-partner/related-party transactions. Lernout and Hauspie co-founded and held ownership shares in the FLV Fund, the undisclosed related party behind many of the 30 Strategic Partners. (¶¶ 23–24, 48, 192, 196, 204, 216, 396, 442). The two men were actively involved in FLV Fund operations. (¶¶ 23, 24, 196). Lernout and Hauspie also created the S.A.I.L. Trust, a purportedly non-profit company which held a one-third interest in the company that controlled the FLV Fund. (¶ 215–216).

Bastiaens and Willaert allegedly knew of Lernout and Hauspie's interests in these related parties, and of the problems they could cause. At a May 4, 1998 Board meeting, the Board acknowledged the "potential conflict of interest" stemming from L & H's involvement with FLV Fund, "given the active involvement of Mr. Lernout and Mr. Hauspie in the management" of both L & H and FLV Fund. (¶ 396).

Lernout, Hauspie, Willaert, and Bastiaens knew about the strategic-partner transactions and that these transactions were being understated by L & H, according to the Complaint. Willaert gave updates to the Board of Directors on L & H's

LDC partnerships on at least two occasions. (¶¶ 402, 405).

The Complaint alleges that, in December 1999, Willaert told the Board that the LDCs contributed a substantial part of L & H's revenues. (¶ 405). Willaert's assessment was certainly correct, as revenue derived from strategic-partner transactions comprised 10% of L & H's total revenue in 1998 and 25% in 1999. (¶¶ 191, 204). L & H, however, reported that these transactions comprised only 3.7% of revenues in 1998, and 0.3% in 1999. (¶ 208).

To further reinforce the allegations that the individual defendants knew of these falsities, plaintiffs state that L & H refused to permit KPMG to meet with the strategic-partner investors (¶ 342), limited KPMG's inquiry into these relationships (¶ 271, 273), and refused to disclose the identity of these investors to the SEC (¶ 422, 429).

Plaintiffs also suggest a strong motive for Lernout to engage in fraudulent related-party transactions. The Complaint alleges, based on Audit Committee Report characterizations, that software license revenue from most of the strategic-partner companies was incorrectly booked, reporting as licensing revenue what was actually funding for L & H future product development. (¶ 439). Plaintiffs claim that these transactions were structured to channel money to L & H because it desperately needed research and development funding. Lernout expressed that L & H was "cooked" if it did not catch up with its competitors in technology. He stated, however, that L & H couldn't catch up because it couldn't get more research and development money. (¶ 338(a)).

Combined, these allegations amount to a strong inference of scienter with regard to the related-party transactions for each of the individual defendants.

## D. *Section 20(a) Claims*

■ Defendants also proclaim that the Complaint fails to adequately plead viable "controlling person" claims against them under Section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a) (2000). Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (2000).

In *Aldridge*, the defendants suggested a three-part test for controlling person liability: "(1) an underlying violation by a controlled person or entity; (2) the defendants control the violator; and (3) the defendants are in a meaningful sense culpable participants in the fraud in question." 284 F.3d at 84 (citing *SEC v. First Jersey Secs. Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996)). The First Circuit recognized a debate among the circuits as to whether the third part of the test, culpable participation, is a necessary element. It did not resolve the issue, however, as the plaintiff's Section 20(a) claim foundered on the control element because defendants, though controlling shareholders, had "no direct control over the management and operations of the company." *Id.* at 85.

The Complaint alleges each of these three elements for each of the individual defendants. Lernout, Hauspie, Willaert, and Bastiaens allegedly made several false and misleading statements during the Class Period, and each signed the 1999 Form 10-K. *See Chalverus*, 59 F.Supp.2d at 236–37 ("[A] court should deny a motion to dismiss a section 20(a) claim when the

defendants themselves made the allegedly false and misleading statements."). Lernout, Hauspie, Bastiaens, and Willaert each exercised control over the decision-making processes of L & H. *See Aldridge,* 284 F.3d at 85 ("To meet the control element, the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company.") Finally—if culpable participation is indeed a necessary element of Section 20(a) violations— the complaint contains sufficient allegations that the individual defendants were actively involved in the perpetration of the underlying fraud.

Accordingly, this Court **DENIES** the motion to dismiss the section 20(a) claim.

### E. *Forum Non Conveniens*

 Defendants Hauspie and Willaert have also moved to dismiss this action on grounds of forum non conveniens. They argue that Belgium is the more convenient forum because they are Belgian citizens who are currently subject to actions pending in Belgium; many of the actions alleged in the Complaint took place in Belgium; three of the four lead plaintiffs are Europeans; and defendants will be limited in their ability to fully and properly defend themselves in the current forum.

"The doctrine of forum non conveniens permits a trial court, on a discretionary basis, to dismiss a case where an alternative forum is ... available in another country that is fair to the parties and substantially more convenient for them or the courts." *Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 719 (1st Cir.1996) (citing *Howe v. Goldcorp Invs., Ltd.,* 946 F.2d 944, 947 (1st Cir.1991)). "But since there is a strong presumption in favor of the plaintiff's forum choice, the defendant must bear the burden of proving both the availability of an adequate alternative forum, and the likelihood of serious unfair-

ness to the parties in the absence of a transfer to the alternative forum." *Mercier v. Sheraton Int'l, Inc.,* 981 F.2d 1345, 1349 (1st Cir.1992) (citations omitted); *see also Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (dismissal for forum non conveniens appropriate when "trial in the chosen forum would establish ... oppressiveness and vexation to a defendant ... out of all proportion to the plaintiff's convenience."). Hauspie and Willaert have not shown either that Belgium is an adequate forum or that serious unfairness will result from hearing the case in Massachusetts.

First, this Court must determine the adequacy of Belgium as a forum for this case. To prove the availability of an adequate alternative forum "the defendant [must] demonstrate[ ] that the alternative forum addresses the types of claims that the plaintiff has brought...." *Iragorri v. Int'l Elevator, Inc.,* 203 F.3d 8, 12 (1st Cir.2000). Citing a case regarding the insurance of fig shipments, *Calavo Growers of California v. Generali Belgium,* 632 F.2d 963, 968 (2d Cir.1980), Hauspie and Willaert proclaim that Belgium has specifically been held to provide an adequate forum for the resolution of fraud claims. While this may be true of the general fraud claims at issue in *Calavo Growers,* securities fraud is another matter.

Although there is no dispute that Belgium would have jurisdiction to hear the case, this Court has two concerns with the adequacy of Belgium as a forum for this class action securities action: Belgium's lack of a class action mechanism and its failure to recognize the fraud-on-the-market theory. Increased difficulty in proceeding as a class in a foreign forum does not, without more, render that forum inadequate. *See Howe v. Goldcorp Investments, Ltd.,* 946 F.2d 944, 952 (1st Cir. 1991) (in securities fraud action against

Canadian corporation, holding that "greater difficulty" in meeting class action requirements deemed "beside the point" of adequacy inquiry); *see also DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 29–30 (2d Cir.2002) incorporating by reference adequacy analysis from earlier vacated opinion, 232 F.3d 49, 57–60 (2d Cir.2000) (deeming Ontario adequate forum because class certification could be achieved). The complete lack of a class action mechanism is, however, an important factor to be weighed in determining the adequacy of an alternative forum. *See Bodner v. Banque Paribas*, 114 F.Supp.2d 117, 132 (E.D.N.Y. 2000) (in suit by plaintiff Holocaust victims against French financial institutions, "the fact that there is not a functional equivalent in France of class-based judicial review strengthens plaintiffs' claim that France is not an adequate forum."); *but see Aguinda v. Texaco, Inc.*, 142 F.Supp.2d 534, 541 (S.D.N.Y.2001) (in tort action, absence of class action procedure "does not ordinarily render a foreign forum 'inadequate' "). The Court has found no cases, and counsel has cited none, where a court has dismissed a securities fraud class action on forum non conveniens grounds where the plaintiff class has purchased stock on the American exchange and no class action remedy was available in the alternative forum. *See Howe*, 946 F.2d at 952 (emphasizing that dismissal on forum non convenience ground was appropriate where all stock was purchased "abroad" in Canada and did not trade on stock exchanges in the United States).

As for the fraud-on-the-market theory, courts have so far been reluctant to find a forum inadequate based on the lack of a recognized fraud-on-the-market doctrine. *See In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 298 (E.D.N.Y.2002) (declining to find inadequacy of forum based solely on lack of a recognized fraud-on-the-market doctrine). When combined with the lack of a fraud-on-the-market theory,

however, the lack of a class action mechanism creates virtually insurmountable concerns regarding the adequacy of the foreign forum. *See Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F.Supp. 1003, 1007–09 (D.N.J.1996) (deeming Canada an inadequate forum because it failed to recognize fraud-on-the-market theory and had just enacted a limited, and undeveloped, class action procedure). Dismissal in favor of Belgium would force each of the thousands of the United States purchasers to file separate actions in Belgium and demonstrate individual reliance on the misstatements. This is a remedy "so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft*, 454 U.S. at 254, 102 S.Ct. 252.

However, even if Belgium were an adequate forum, when some deference is given to plaintiffs' choice of forum, defendants fail to demonstrate that the balance of public and private factors compels dismissal in favor of Belgium. *See Iragorri*, 203 F.3d at 12 ("defendant must show that the compendium of factors relevant to the private and public interests implicated by the case strongly favors dismissal."). The private interest factors include (1) relative ease of access to sources of proof; (2) availability of compulsory process; (3) comparative trial costs; (4) ability to enforce a judgment; and (5) "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Nowak*, 94 F.3d at 719 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). As for public factors, this Court must consider (1) practical difficulties of unnecessarily imposing upon a busy court the obligation to hear a case more fairly adjudicated elsewhere; (2) the imposition on jurors called to hear a case that has no relation to their community; and, (3) the familiarity of this court with applicable laws. *Nowak*, 94 F.3d at

719–20. This list of factors is "illustrative rather than all-inclusive" and constitutes "a helpful starting point...." *Iragorri*, 203 F.3d at 12.

I find that the balance of private factors warrants hearing the case in this District. To begin with, the case involves an alleged fraud that spans three continents. Any forum is likely to have the kind of evidence and witness problems described by Hauspie and Willaert. Defendants suggest that evidence and witnesses relevant to this case are likely to be located in Belgium. Plaintiffs counter that this representation contradicts Hauspie and Willaert's representations to the District Court of Delaware regarding the convenience of Massachusetts as a forum made when requesting transfer of the related Delaware cases. Plaintiffs also point to L & H's United States headquarters as an likely source of evidence and to the 33 boxes of documents already produced by defendants to the SEC. Defendants claim that some of the Belgian witnesses are subject to criminal investigations in Belgium and may not be able to leave. While the litigants may face problems in persuading unwilling third-party witnesses to appear in the United States, sufficient alternative arrangements, such as videotaped depositions obtained through letters rogatory, can be used.

Moreover, the confusion and expense associated with forcing each class member in the United States to individually sue defendants in Belgium would be tremendous and strongly weigh against dismissal. *See Cromer Finance, Ltd. v. Berger*, 158 F.Supp.2d 347, 362 (S.D.N.Y.2001) (in securities fund class action, lack of class action mechanism considered as factor weighing against dismissal because of possibility of "multiplicitous global litigation").

The public factors tilt against dismissal as well. This Court has already invested considerable time in this case, and would gain no substantial savings of time or effort by dismissing these two defendants. The case also has substantial relation to its present forum: Massachusetts is home to the defendants' United States operations; a substantial number of class members are from the United States; and the class consists solely of plaintiffs who purchased L & H stock on the NASDAQ exchange. Trading volume of L & H common stock on NASDAQ was 5 times more than on EASDAQ, adding to the United States' interest in this case. (Aff. of Jeffrey Block in Support of Pl.Opp. to Mot. to Dismiss, ¶ 2). *See In re Livent, Inc. Sec. Litig.*, 78 F.Supp.2d 194, 210 (S.D.N.Y.1999) (citing fact that "trading in Livent on NASDAQ far exceeded trading on the Toronto Exchange" as demonstrating strong local and national interest in United States adjudication). This country has a strong interest in enforcing its securities laws. Finally this Court has not been asked to apply any foreign law in this case, while the Belgian court would most likely have to navigate the intricacies of United States securities law.

Neither public nor private factors warrant dismissal of this case against Hauspie and Willaert. This Court, in its discretion, declines to dismiss this case for forum non conveniens.

### *ORDER*

For the reasons stated above, the motions to dismiss brought by defendants Lernout, Hauspie, Willaert, and Bastiaens (Docket Nos. 169, 183 and 191) are *DE-NIED*.